# LAMOILLE COUNTY,

[ Continued from *ante*, page 70.]

DAVID GOULD AND MARY, *his wife*, AND JEDD P. SAFFORD, *by his Guardian*, HANNAH SAFFORD, *Appellants, v.* JOSEPH P. SAFFORD'S *Estate.*

## *Nuncupative Will of Soldiers.*

A nuncupative will of "a soldier in actual military service" may be established in a court regulated and controled by the rules of the common law, upon the testimony of one witness only.

The deceased, while a soldier "in actual military service," within the meaning of the statute, declared to his comrades, that he desired a certain Uncle and Aunt named to have enough of his property to make them whole, stating that he had lived with his Uncle through several winters, and that his Aunt had taken care of him through a fit of sickness, and neither had ever been paid therefor; and declared that he had a brother and wanted the remainder of his property, which was personal, to go to him; and requested a comrade, (the witness introduced to prove the will,) to write to a person named what disposition he desired to be made of his property. *Held,* that these declarations and requests were sufficient to make a good military testament.

The deceased belonged to a company and regiment in the "Potomac Army," when that army was moving from Virginia to Maryland to cover the cities of Washington and Baltimore and repel the rebel invasion of Maryland in the campaign which terminated with the battle of Antietam; and when his regiment was at Tenallytown, not far from Washington, in this movement, the deceased and O., another soldier, were sick and were ordered by their captain. with the approval of the regimental surgeon, to fall out and come on when they got rested. They continued sick and were sent the next day by another army surgeon to Wash-

ington, and were then taken by order of the medical director to Harewood Hospi-
tal, then just established about two miles from the city; and there the surgeon
in charge informed the deceased, as soon as he examined him, that he had not
long to live, and that whatever requests or dispositions of his property he had to
make, he must do speedily. The deceased then made the above declarations and
requests and died soon after. *Held,* that he was at that time "in actual military
service," within the meaning of the statute.

THIS was an appeal from the decree of the probate court, allowing
the probate of the nuncupative will of Joseph P. Safford. Trial by
court at the December Term, 1864, ALDIS, J., presiding.

The following facts were admitted in the case :—Joseph P. Safford,
the deceased, enlisted as a soldier in the third regiment of Vermont
Volunteers, company E., from Elmore, Vermont. He was mustered
into service at St. Johnsbury, Vermont, on the 16th of July, 1861,
started for Washington the last of July, and went immediately to the
front. He had an own brother, Charles, a half brother, Jed P., and
a half sister, Mary Gould. His father died before the son, Joseph
P., (the testator,) died. The deceased, Joseph P., had at the time
of his death about one thousand dollars in personal property. He
died at Harewood Hospital, in the district of Columbia, on or about
the 15th of September, 1862.

The situation of the deceased at the time he made the declarations
and requests testified to, is fully stated in the opinion. The witness,
Frank A. Olmstead, after detailing all the facts pertaining to the
deceased up to his death, testified that after the talk of the deceased
with the surgeon, referred to in the opinion, the deceased said to
him, the witness, as follows :—"after this talk with the doctor, he said
to me in the course of the day two or three times that he wished his
brother to have his property. That afternoon I wrote the letter [let-
ter was produced on trial and dated September 13th.] After writing
I asked him if there was anything he wished me to write. He said
he would like to have me write to Mr. Chaplin, (who lived near
Elmore, and whom my brother, to whom I wrote the letter, often
saw,) what he wanted done with his property. He said that he had
lived at his Uncle Page's winters, and had made his home there and
had never paid him anything. He wanted his Uncle Page to have
enough of his property to make him whole. He wanted his Aunt

Gould et al. *v*. Safford's Estate.

Beeda to have enough to make her whole, for he had had one fit of sickness there and had never paid her anything. The remainder of his property he wanted his brother Charles should have. He said he had an own brother and wanted him to have his property. In writing the letter I made a mistake in the name. He was very low and it tired him to talk. I knew they would know who his own brother was and I did not ask him the name over again because it tired him to talk. I wrote this letter for him as he then told me. After that I remained with him till he died. He kept sinking away, was very weak and troubled for breath, and so his breath kept growing weaker till he died.

Cyrus Meeker of Waterville, Vermont, was in the tent when the doctor told him he could not get well, and when he made these requests, and when I wrote, and some others whose names I do not recollect. They heard him. Meeker is since dead. He sat near by but was not called on as a witness. He (Joseph) died in from three to five days after. I cannot tell exactly. He was in his right mind when he made these requests. He also wished his brother to get his father a set of gravestones, I think he hoped to get well after he made this will; I think he hoped to get well till the day he died."

The court found the facts to be as testified to by Olmstead, and that the deceased, Joseph P. Safford, gave the directions to Olmstead in regard to the disposition of his property as testified to by Olmstead, that in the letter there is an error in the name—it being in the letter "William" where it should be and was intended to be "Charles," and that in writing the name Olmstead made a mistake; that the deceased was *in extremis*, and was conscious of the near approach of death, and that he could not live long when he made these requests and directions; that he made them with the intention of disposing of his property by will; that he was in the actual military service of the United States; that Harewood Hospital was then in the condition and used and occupied as the witness describes, and that the deceased, in the circumstances and condition in which he went there and staid till his death, should be considered as in the actual military service of the United States. When soldiers are sent to the general hospitals of the government they are reported as

absent from their commands. As to this case of Safford's and his being sent to Harewood Hospital, under the circumstances and in the condition of the hospital as it then was, there was no evidence that he was or was not reported as absent from his command.

The court found that no witnesses were called by the deceased, except as the giving of these directions to Olmstead was the calling of him to be a witness.

The court considered the declarations and directions to Olmstead as constituting a good nuncupative will in favor of his brother Charles as the legatee of all his property after paying the amounts justly due to his Uncle Page and his Aunt Beeda. The decree of the probate court allowing the will was therefore affirmed.

The court found that he, Safford, died on the 15th or 16th of September.

To the decision of the court the appellants excepted.

In the letter referred to, the witness, Olmstead, wrote to his brother, as follows :—"Joseph Safford wants you to tell Mr. Chaplain to tell Mr. Page, of Morrisville, that he wants he should take out enough of his property to make him whole, and then give his Aunt Beeda Gates enough to repay her for her trouble, and the remainder to go to his brother, Wm. S.

He wants his brother to see that his father has a good set of grave stones. Now do not say anything to any one about this until you learn that he is dead."

It appeared on trial that the deceased made certain requests and declarations to G. W. Hendee, Esq., at St. Johnsbury, after having enlisted and before his regiment departed for the war, similar to those made to Olmstead, which were reduced to writing, and were claimed to constitute a nuncupative will, but this claim is not discussed in the opinion.

*Powers & Gleed*, for the appellants.

I. The whole policy of the law as gathered from text writers, legislative acts and judicial decisions, is adverse to the allowance of nuncupative wills of any class ; this arises from the frequent instances of fraud reported, and the loose and unsatisfactory manner in

Gould et al. *v.* Safford's Estate.

which they are usually proved. The exception in the English Statute of Frauds in favor of soldiers and seamen, and which is retained in the late English statute of wills, simply leaves the wills of these persons subject to the constructions which governed all nuncupative testaments, prior to the passage of that act. Our statute is precisely like the English act. '29 Car. 2 ch. 3, § 23, act 7; William iv. & 1 Vict. ch. 26, § 11 ; G. S., Vt. ch. 49, § 9. In other words, soldiers may now make their wills, precisely as *soldiers* and *civilians* made them prior to the new Wills' act—and every element, then, indifferently required of all persons, must still exist and be proved in modern military testaments. Redfield on Wills, 188, 190.

II. It is necessary that the *factum* of the will should be established by the most plenary and satisfactory proof. Redfield, 188 ; *Hubbard* v. *Hubbard*, 4 Seldon, 196 ; Jarman, Title, Nuncupative Wills.

That the testamentary words were spoken by the deceased with the *purpose* and *intent* to have them take effect at his death *as a will.* See Redfield, *supra ;  Hubbard* v. *Hubbard* ; *Drummond* v. *Parish,* 3 Curties' Eccl. Reports.

III. That as a consequence of the second proposition the witnesses must be especially called upon to take notice that the deceased is making a will, see cases above cited.

IV. The testator must be *in extremis* and without time and opportunity to make a written will. 2 Black. Com. 500 ; Swinburne p. 1, § 12, cases above,

V. He must be in "*actual military service,*" which the English Ecclesiastical Courts hold to mean that, *at the time of the nuncupation,* the soldier should be on an expedition.

Military testaments have been subjected to peculiar regulations by various English statutes which must be of force here. 26 Geo. III. ch. 63 ; 32 Geo. I. ch. 34 ; 11 Geo. IV, §. 20, 2, 48, 49, 50 and 2 & 3 Will IV, ch. 40, §§ 14, 15.

1. The better doctrine seems to be that one witness is insufficient to establish a nuncupative will. The exception in favor of soldiers is borrowed from the civil law and with the exception we must take the rule of the civil law which requires at least two witnesses to establish such wills. Redfield's observations, pages 193–4.

2. There is nothing in the language of Safford that indicates the *animum testandi*.

3. The authorities all agree that the testator should be proved to be *in extremis*. *Drummond* v. *Parish*, 3 Curtis' Eccl. Reports ; *Hubbard* v. *Hubbard* ; Redf. and cases therein cited ; *Prince* v. *Hogdton* ; the facts in this case negative the idea of Safford's being *in extremis*.

4. He was not at the time in *actual military service*. If Safford had been in a field hospital, which might be said to travel with the army, it might be argued with more plausibility that he was on an expedition, but the case shows that he was discharged from the expedition and sent to the rear ; he was withdrawn from " *actual* " and active " *military service* " and placed where he was neither under the orders of the commander of the expedition, nor in fact in the discharge of any *actual military duty*. If Safford in Harewood Hospital was *in expeditione*, so would be a soldier quartered at the general hospital at Montpelier, or Burlington, or on David's Island.

The case in New York of mariners hold it requisite that the testator "*be at sea*," and in *Hubbard* v. *Hubbard*, 4 Selden, the court lay great stress on this point, and it is to be noticed that the testator there was most emphatically *in extremis*, being attacked with that most fatal disease, Asiatic cholera, and dying the same day. See, also, the case in Bradford's Surrogate Reports, also *Warner* v. *Harding*, 2 R. I. 135 ; see, also, 29 Eng. Law & Eq. 604 ; so that in the case of mariners the " being at sea," at the time of the nuncupation, which simply means being removed from the opportunities and means of making a written will, is the very first point to be made out in establishing a nuncupative will—where is the *locus in quo* is the first question propounded—so in the case of soldiers, it is equally essential to observe *where* the will is made, and what the "*actual*" service.

*George W. Hendee* and *Geo. Wilkins*, for the appellee, maintained that all that is required in order to make a good nuncupative will was done September 13th, 1862, by the testator. The will was reduced to writing within six days. He was of sound mind and

memory, had the *animum testandi,* was *in extremis,* and was in the
actual military service of the United States, and the will was offered
for probate within six months after the death of the testator.

Argued at the August Term, 1865, before PIERPOINT, KELLOGG
and PECK, JJ. At the present term the opinion of the court was
delivered by

KELLOGG, J. The question in this case is whether the declara-
larations and requests of the deceased, Joseph P. Safford, to
the witness, Frank A. Olmstead in respect to the disposition of
his estate after his decease, should have effect as a valid testa-
mentary disposition of his personal estate on the facts found by
the county court. The ground upon which it is claimed that these
declarations and requests were effectual as a nuncupative will is
that, at the time when the same were made, the deceased was
" a soldier in actual military service," within the meaning of the
statute. It is settled by the findings of the county court that these
declarations and requests were made by the deceased *animo testandi,*
or with the intention of disposing of his property by will, and while
he was *in extremis,* and conscious of the near approach of death ; and
we think that these findings were fully justified by the evidence
detailed in the bill of exceptions. ' It also appears that the deceased
died within two or three days after making these declarations and
requests, and no question is made but that he was of full age, as
well as of sound mind at the time of making them. If he was not
then "a soldier in actual military service," it is conceded that these
declarations and requests would fall within the operation of the gen-
eral provisions of the statute in respect to nuncupative wills, (Comp.
Stat., p. 327, § 8 ; G. S., p. 377, § 8,) and could not be established
as a valid testamentary disposition of his personal estate.

It is unnecessary to consider whether the validity of a nuncupa-
tive will made by "a soldier in actual military service" is affected by
the fact that it was made when the soldier could not be regarded as
being *in extremis,* because it appears that the deceased, at the time of
making the alleged testamentary disposition of his property which is
now in controversy was actually *in extremis ;* but it is a necessary

preliminary to the consideration of the principal question in the case that it should be determined whether such a will can be established by the testimony of only one witness. The appellants, who contest the validity of the alleged will in this case, claim that as military testaments were derived from the Roman or civil law, they should be established by the same amount of proof which was required by the rules of the civil law. Under the rules of the civil law, a controverted fact must be established by the testimony of at least two witnesses; but, under the rules of the common law, the testimony of a single witness, where there is no ground for suspecting either his ability or his integrity, is a sufficient legal ground for belief, even in criminal cases. 1 Starkie's Ev. 485; 3 Black. Com. 370. The trial of this case was in a court of common law, and we have not been able to find any case in which any other rules of proof than those of the common law have been recognized or held as applicable in such courts. The substance of the last testamentary request, declaration or act of the deceased was the particular fact which was necessary to be judicially established on the trial, and we think that it was sufficient to establish this fact by the same amount of proof which would be required to establish any other fact material to the probate of a will, such as the death of a testator, or that his residence was within the jurisdiction of the probate court at the time of his death. For the proof of a fact of that character, the testimony of a single witness, if uncontradicted, would clearly be sufficient. The rule of the civil law was merely a rule of proof, and did not relate to the essence of the act; and, by the analogy of practice in courts of common law, a testamentary disposition of property, such as the one now in controversy, may be established in a court regulated and controlled by the rules of the common law upon the testimony of one witness only. Redfield on the Law of Wills, p. 194; *Ex parte Thompson,* Bradf. Surr. Rep.. (N. Y.,) 154.

At common law, previous to the Statute of Frauds, (29 Car. 2 c. 3,) a parol will, even of lands devisable, was good, and a written will might be revoked by parol. *Rolfe, Widow* v. *Hampden, Knight,* 1 Dyer's Rep., 53, b. pl. 13; *Brooke* v. *Warde,* 3 *ib.,* 310, b. pl. 81. Nuncupative wills were not forbidden by the Statute of Frauds, but

32

they were placed by it under such restrictions as practically abolished them, and the courts have enforced these restrictions by uniformly holding that the provisions of the statute must be strictly complied with to entitle any such will to probate. Such wills are now tolerated or established only upon the clearest proof of the observance of every statute requisite. But the Statute of Frauds provided (§ 23,) that, notwithstanding that act, "any soldier being in actual military service, or any mariner or seaman being at sea, might dispose of his movables, wages, and personal estate as he or they might have done before the making of the act." The provisions of the Statute of Frauds were first adopted as a part of the statute law of this state in the year 1797, and from that time to the present day, the provisions of section 23 of the Statute of Frauds have formed a part of our statute law. Acts of 1797 in laws of Vermont, Tolman's Comp. vol. 1, p. 121, § 5; Acts of 1821, p. 38, ch. 3. § 19; Slade's Comp. Laws, p. 337, § 19; Comp. Stat. p. 328, § 9; G. S. p. 377, § 9. The omission of the word "military" in the Act of 1821, did not affect the meaning of the statute, and this word was again inserted in the statute in the revision of the statutes in the year 1839. No statute law was ever in force in this state by which the testamentary privilege of "a soldier in actual military service," as that privilege existed before the Statute of Frauds became a law in the year 1677, was restricted, or limited, or in any manner interfered with; and, before that statute was passed, a will of personal estate, made by word of mouth only, would have been as operative as a will executed in writing in the most formal manner. 4 Kent's Com., 516. The civil law was very indulgent in respect to the wills of soldiers, and if a soldier wrote any thing in bloody letters on his shield, or in the dust of the field with his sword, it was held a good military testament. 1 Black. Com. 417. No particular formalities were necessary to the validity of such a testamentary disposition of property; and we are informed by Swinburne, whose treatise on wills was published before the Statute of Frauds was enacted, that only those solemnities were necessary which are *juris gentium*; that no precise form of words was required, and that it was not material whether the testator spoke properly or improperly, if his meaning appeared;

and that soldiers are clearly acquitted from the observation of the solemnities of the civil law in the making of their testaments. Swinburne on wills, part 1, § 14, part 4, § 26.  It is well said in the opinion of the Surrogate in the case of *Ex parte Thompson, ubi supra,* that "the very essence of the privilege consists in the absence of all ceremonies as legal requisites, or, as Merlin states the proposition, "the form was properly to have no form."   Tried by these rules, there can be no doubt that the declarations and requests of the deceased to the witness Olmstead were sufficient to make a good military testament, and ought to be established as a valid testamentary disposition of his estate if, at the time of the alleged nuncupation, he was "a soldier in actual military service," within the meaning of the statute ; and this brings us to the consideration of the remaining question in the case.

The words "*in actual military service,*" used in section 23 of the Statute of Frauds, and in the revised wills act of 1 Vict., ch. 26, § 11, received a full consideration in the case of *Drummond* v. *Parish,* 3 Curt. 522, (7 Eng. Eccl. Rep., 496, S. C.,) in which it was held that these words referred to and were intended to designate a service *on an expedition,* and that the privilege, as it respects the British soldier, was limited and confined to those soldiers only who are on that particular service.   We are entirely satisfied with this interpretation of the statute, but what shall be considered as an expedition is, in some measure, a question of fact depending on the circumstances of the particular case,   The deceased was a soldier belonging to a company and regiment which formed a part of the " Army of the Potomac" in the recent war of the rebellion, and his company and regiment were unquestionably "in actual military service," in the sense in which those words were interpreted in the case of *Drummond* v. *Parish,* on the 13th of September, 1862, when he made the declarations and requests which are relied on as being of a testamentary character in this case.   He had been with his company and regiment through the battles of the peninsular campaign, and, in the latter part of the previous month of August, had been transferred with the entire "Army of the Potomac," to the vicinity of Washington.   The rebel forces, inspired by their successes on the Chickahominy and at

Cedar Mountain, which were then recent, were threatening an invasion of Maryland and Pennsylvania; and the second battle of Bull Run, and the battle of Chantilly at the close of August and the beginning of September had resulted disastrously to the Union forces. In the first week of September, the safety of the national capital was seriously endangered by the presence of a victorious enemy, who soon after crossed into Maryland, and directly threatened both Washington and Baltimore. Washington was in fact a beleagured city, and its entire vicinity was a tented field, and the whole "Army of the Potomac" was engaged in constant movement to cover these important cities and repel the invasion of the enemy. The rebel forces which were engaged in this invasion were decisively defeated in the battles of South Mountain and Crampton's Gap, on the 14th of September, and at Antietam on the 16th and 17th of September, and were driven back into Virginia. The company and regiment to which the deceased belonged was a part of the force which was kept in daily movement to meet the enemy and repel the invasion. While the regiment was on the march to find and engage the enemy, the deceased and the witness, Olmstead, who had been left behind on picket duty, rejoined it at Tenallytown, a village situated in the District of Columbia, a few miles from Washington. The deceased was then sick and very weak, and he and Olmstead, who was also sick, were ordered by their captain, with the approval of the regimental surgeon, "to fall out, and come on when they got rested." On the next day, both he and Olmstead being unable to go on, reported to another army surgeon, by whom they were sent in an ambulance to the army medical director at Washington. By this medical director they were sent to a hospital for soldiers, called Harewood Hospital, situated in the district of Columbia, about two miles from Washington. This hospital had then been recently established, and was without barracks or other shelter except tents, and its arrangements and conveniences were of the most temporary character. It was in fact nothing more than a field hospital at that time. After arriving at the hospital, the deceased and Olmstead were put into a hospital tent in which were eight persons, some of whom were sick and some wounded, but they were then so weak that they could render no

assistance in putting up the tent, and were not even able to help themselves. After they were put into this tent, they were examined by a physician in attendance who found the deceased in the last stage of pulmonary disease, and told him, among other things, that he had not long to live, and, "that if he had any requests to make, or wished to do any thing to dispose of his property, he had better do it immediately." This was on the 13th of September. The deceased, after he was so informed by the physician, and on the same day, made the declarations and requests to the witness Olmstead which are proposed to be established as a testamentary disposition of his personal estate, in the presence of the person occupying the tent with him. It is apparent that, at that time, all facilities for making a formal will were as much if not more inaccessible to him in the hospital than when he was on the march with his regiment. When he was ordered by his captain at Tenallytown "to fall out and come on when he got rested," he was in no sense relieved from military duty or command, but was subject at any moment to be called upon to rejoin his company. He could not be considered as absent on a furlough, for he had no leave of absence from military service, and he remained behind in obedience to an *order*. The entire army to which he belonged was at that time " on an expedition," and, in our judgment, he was as much on that expedition while in the hospital tent at Harewood Hospital as when he was in his own tent with his company and regiment at Tenallytown. He was then in the presence of actual war, and was · surrounded by its perils ; and, although he was in a hospital, he was as much in the line of military service, if he was there in obedience to an order from proper authority, as he would have been if he had been left behind on picket duty. In the opinion delivered in the case of *Drummond* v. *Parish*, *ubi supra*, it is stated that it appears from the preface to the life of Sir Leoline Jenkins, the eminent civilian who was said to have been associated with Sir Matthew Hale and Lord Keeper Guilford in the preparation of the Statute of Frauds, that he claimed the merit of having in that statute secured to the soldiers of the English army the full benefit of the testamentary privilege of the Roman soldier. If we regard the nature and object of this privilege, and the situation

of the deceased, at the time he made the declarations and requests to the witness Olmstead in respect to the disposition of his estate after his decease, we can come to no other conclusion than that, in the sense and meaning of the statute, the deceased was at that time " a soldier in actual military service," and that there was no error in the finding of the county court to this effect.

The judgment of the county court in favor of this alleged nuncupative will of the deceased as a valid testamentary disposition of his personal estate is accordingly affirmed.