Leathers *v.* Greenacre.

--------◇-----

CYNTHIA S. LEATHERS, *Adm'x, versus* JAMES GREENACRE.

At common law, a will of personal property, written in the testator's own hand, without seal, though no witnesses were present at its publication, is good; and no particular form of expression is material, if only the testator's intention is manifest.

By R. S., c. 74, § 18. " a soldier in actual service, or mariner at sea, may dispose of his personal estate and wages," as he might have done under the common law.

The terms " in actual service," and " engaged in an expedition," are synonymous.

Leathers *v.* Greenacre.

The term "expedition" is not to be confined to that movement of the troops which immediately precedes the actual conflict and shock of battle.

If, during the late rebellion, — and after he had been mustered into the military service of the United States, but while he remained in barracks, or while thus quartered at any military station in one of the loyal States not exposed to the incursions of the enemy, and before he had crossed over to the seat of war with his regiment to take part in the hostilities existing there, and before he had begun to move under military orders against the foe, — a soldier had made a will without observing the usual statute formalities, it would not be deemed the will of a "soldier in actual service," and therefore not entitled to probate as such.

But having marched into the enemy's country from which he never returned, and encamped among a hostile population, and acting in conjunction with soldiers who were confronted by the rebel army, although he was in winter quarters and not, at the time of making his will, occupied with any present movement of the troops, but was on some service detached from his own regiment, he would be deemed a "soldier in actual service," and his will be sustained if good at common law.

In August, 1862, J. B. L. enlisted in the first regiment of Maine cavalry, and was thereafterwards, in the same month, mustered into the U. S. military service. March 6, 1863, while lying in camp at Stafford C. H., Va., he wrote a long letter to the defendant, (with whom he had previously deposited the two notes mentioned in his letter,) in which he said: — "As life is uncertain, I will give you my wishes in regard to my property, if I should fall here." "The face of the note that" G. H. L. "owes me and now in your hands, and also the note against" C. S., "and interest, I want you to distribute among my brothers and sisters as you think proper, and all other property to my wife, (naming her) and for her to pay my debts," (signed.) March 2, 1864, he started on a raid to Richmond in company with others under military orders, was captured and died in prison, March 16, following; — *Held,* that J. B. L. was a "soldier in actual service," when he wrote the letter, and that it was a will entitled to probate.

On facts agreed.

The facts appear in the opinion.

*D. D. Stewart,* for the plaintiff, submitted an elaborate brief; but owing to the view taken by the Court, a report of but one point becomes necessary.

Prior to writing the letter, Leathers had been in no " actual military service," nor was he in any until the following January, a period of ten months afterwards, and then only in some unimportant raiding.

The English statutes, 29 Car. 2, c. 3, and 1 Vict., c. 26; § 11, are exactly like ours. Under this, the English courts

Leathers *v.* Greenacre.

have invariably held that, to entitle a soldier to claim the benefit of its provisions, he must be, at the time of making his will, actually out upon an expedition. If actually engaged upon an expedition, the will would be valid whether verbal or written. No case can be found where the will of a soldier, not duly drawn and witnessed like those of other persons, has ever been allowed, except when engaged in actual warfare, and out upon an expedition. The word "actual" is significant, and means what the authorities all hold, that the soldier must be engaged in actual warfare, and to be so, he must be out on an expedition. *Drummond* v. *Parish*, 3 Curteis, 522. In the goods of Hill, 1 Robertson, 276. In the goods of Admiral Austin, 18 Eng. L. & Eq., 598; 1 William's Ex'r's, 96, and cases cited; 1 Redfield on Wills, 191, and cases cited; *ex parte* Thompson, 4 Brad. Sur. R., 154. Many authorities hold that the soldier must not only be *in expeditione*, but also *in extremis*. 1 Redfield on Wills, 190; *Hubbard* v. *Hubbard*, 4 Seld., 196.

In *Bowles* v. *Jackson*, 1 Spink's Eccl. & Ad. R., 294, the facts were as follows :— Alfred Jackson, the deceased, was a captain in the 30th regiment infantry, and stationed with his regiment at Neemuch in Bombay, 1839. On Aug. 14, 1839, he received orders to march, on Aug. 22, to attack the citadel of Joadhpore. On Aug. 20, he made and signed his will, but it was attested by only one witness. On Aug. 22, agreeably to orders, he marched with his regiment to attack Joadhpore; and while on the march, was seized with illness and sent back as far as Musserabad, where he died on Oct. 13, following. Sir John Dodson, in delivering the opinion of the Court, said :— "I am of opinion that, in this case, the military privilege does not apply. It cannot be said that, at the time this will was made, this gentleman was *in expeditione*. The orders to march were not immediate; he had full time to make, and he did make a will; but unfortunately, not in accordance with the requisites of the law. Will rejected."

This case is decisive of case at bar. Deceased in camp

when he wrote the letter, in good health, expected to " see fighting in the spring," did not, however, until a year afterwards; he had ample time and opportunity to make a will in conformity with the law. No occasion to allow him privileges not common to others, particularly when such privileges will operate greatly to the disadvantage of his wife and legal heirs.

The exceptions should be applied with great strictness. In the goods of *Henry Corby*, 29 Eng. L. & Eq., 604, and cases above cited. And it is the general policy of the law that wills must be executed in conformity to its provisions or they must be held inoperative. *Tucker* v. *Scammon*, 7 Met., 204; *Thayer* v. *Wellington*, 9 Allen, 283.

*J. S. Rowe*, for the defendant.

BARROWS, J. — The plaintiff, widow of John B Leathers formerly of St. Albans in this county, having been duly appointed administratrix upon her late husband's estate, brings this action of trover against his brother-in-law under the following circumstances : — John B. Leathers enlisted in the First Maine Cavalry Regiment and was mustered into the service of the United States in August, 1862, and continued in the service until his death, which took place at Richmond, where he was held a prisoner by the rebels, March 16, 1864. A few days after his enlistment, and before he left this State, he entrusted to the defendant two promissory notes payable to himself, with written directions to " collect them and let any one of his friends who needed them most" have the proceeds, in case he gave no further directions. The defendant collected one of the notes and invested the proceeds in a bond of the city of Bangor which he now holds, together with the other note which, though admitted to be good, has never been collected. Previous to his enlistment, Leathers had been engaged in trade at St. Albans in company with one Tracy, but the business was broken up and the partnership dissolved in the fall of 1861, by the attachment and sale (at the instance of their creditors) of the company

property which proved insufficient to meet their indebtedness, from $300 to $500 of which still remains unpaid. Leathers also owed private debts still unpaid to the amount of at least $600. His entire property, real and personal, aside from this claim against the defendant, according to the appraisal in the inventory, was but a little more than $1000, and no allowance or provision has been made for the widow. After her appointment as administratrix, and before the commencement of this suit, she made a demand upon the defendant for the bond and note, and he declined to give them to her, though then and still in his possession. He bases his defence upon a letter from Leathers written at Stafford Court House, Virginia, March 6, 1863, containing matter of the following tenor.

* * * * * "In regard to the Skinner note want you to do as you think best with the money if paid to you. Most likely you have arranged it before this. In regard to my other affairs at home think Cynthia (the plaintiff) will manage them somehow."

"Stafford Court House, Va., March 6, 1863,

"As life is uncertain I will give you my wishes in regard to my property if I should fall here in the service of my country. The face of the note that Gilbert H. Leathers, my brother, owes me and now in James Greenacre's hands and also one other note, against C. Skinner of St. Albans, and interest, I want you, James Greenacre, to distribute among my brothers and sisters as you think proper, and all other property to go to my wife Cynthia and for her to pay my debts, there being only one debt due from me which is due Alphonso D. Leathers, for other debts are company debts.                    "John B. Leathers.

"The weather is cool to-day and we are expecting Gen. Hooker to inspect the brigade in a few days, and then we expect to join our regiment, and most likely we will see some fighting this spring as I think the Army of the Potomac are well rested and are anxious to get home.

"John B. Leathers."

Now it is plain that, whether this letter is entitled to probate as a soldier's will or not, inasmuch as it never has been presented to the Probate Court and admitted to probate, it could be of no avail in defence of this suit brought by the legal representative of the deceased, were it not for the stipulations which the parties have seen fit to make in reporting their case. No will of the deceased having been presented for probate, the plaintiff was in good faith duly and regularly appointed administratrix, and gave her bond pursuant to R. S., c. 64, § 14, conditioned among other things, to deliver the letters of administration into the Probate Court in case any will of the deceased should be thereafter duly proved and allowed, — to administer according to law all the goods,. chattels, rights and credits of the deceased, — to render her account thereof, and to pay and deliver any balance, or any goods, chattels, rights and credits remaining in her hands upon such settlement to such persons as the Judge of Probate should direct; and while her authority remains unrevoked she not only has the right but *is bound* to use due diligence to secure and collect the outstanding credits belonging to the estate, and the custodian of an alleged will cannot set it up to defeat her lawful claim until it shall have been duly proved and allowed.

It is to be regretted, under the peculiar circumstances of the present case, that we are not at liberty, upon this report, to dispose of it in accordance with this obvious view; for, even if we find that the letter above recited is entitled to probate as a valid will of personal estate, still the claims of the beneficiaries referred to in it must be postponed to those of creditors, and to those of the present plaintiff, the widow of the. deceased, should she, as she undoubtedly would, waiving the provision made for her in it, when it shall have been proved and allowed, ask and receive an order of allowance from the Probate Judge. Looking at the condition of the estate, it seems hardly probable that, when these claims shall have. been satisfied, anything will remain to be distributed according to the request in the letter. But

the defendant has stipulated and the plaintiff agreed that, if any action by the Probate Court upon the paper above recited would make the defence effectual, the case shall be treated in the same manner as if such action had been had before the commencement of this suit, the defendant binding himself immediately to take the necessary steps in the Probate Court in accordance with the opinion. If the paper had been allowed by the Probate Court as the will of the deceased, it would have become the duty of the plaintiff forthwith to return into the Probate Court her letters of administration, which constitute her authority to commence and prosecute this action, and she could thereafterwards represent the estate only under letters testamentary or letters of administration with the will annexed, neither of which have ever issued to her. Under the foregoing stipulations, it becomes necessary, then, for the Court to determine whether this paper is entitled to probate as the will of John B. Leathers.

No one who reads it can doubt that it falls within the general definition of a will, — which is said upon good authority to be "the declaration of a man's mind as to the manner in which he would have his property or estate disposed of after his death." 1 Jarman on Wills, 1.

It is not attested according to the implied requirements of R. S., c. 74, § 1.

Was the decedent relieved by his peculiar position from observing the formalities required in ordinary cases? Is it a valid will at common law?

Wills are of two sorts — *written* and *verbal*, or *nuncupative* — the latter depending merely upon evidence of the declarations of the testator, made *ore tenus*, in the presence of witnesses and subsequently reduced to writing.

Although Swinburne lays it down, (pt. 1, § 3, pl. 19,) that the naming of an executor is indispensable to the validity of a will, yet that idea has long been abandoned in England, and never was received on this side of the Atlantic; so that we need trouble ourselves with no supposed

distinction between wills and testamentary papers arising from that source. And even while the distinction prevailed in England, such a paper was wont to be held binding upon the administrator under the appellation of a codicil, the ancient definition of which was, according to Swinburne, (pt. 1, § 5, pl. 2,) "a just sentence of one's will touching that which any would have done after their death, *without the appointing of an executor*,—an " unsolemn will,"—differing only from the general definition which the same ancient writer had previously given, (pt. 1, § 2,) of *a will*, in the single point that no executor was named therein. The definition is obsolete. With us it is not uncommon to add a codicil for the purpose of naming an executor where it has been omitted in the will, and a paper of unmistakable testamentary character is none the less a will because no executor is therein named. Our statutes provide for the granting of administration *cum testamento annexo* in such cases.

It is unnecessary to determine whether, if the letter is a valid will, there is a constructive appointment of the plaintiff as executrix of it. She does not sue in that character, and, as we have already seen, if the letter is entitled to probate as the will of Leathers, under the stipulations in this report it is fatal to the plaintiff's suit.

At common law, a will of personal property written in the testator's own hand, though without signature, or seal, or witnesses present at its publication, upon proof of the handwriting, was held good. Nor was any particular form of expression material if only the testator's intention was manifest.

Letters of a character similar to the one produced by the defendant here, and even less definite and intelligible than this, have been repeatedly established as valid wills of personal estate. *Hubberfield* v. *Browning*, 4 Vesey, jr., 200, *in notis;* 3 Dane's Abridgement, c. 90, art. 12, § 1; *Boyd* v. *Boyd*, 6 Gill & Johns., 25.

Before the Statute of Frauds, (29 Car. 2, c. 3,) the ecclesiastical courts, to whose jurisdiction the establishment of

testaments relating to personal estate belonged, required no ceremonies in the publication thereof, or the subscription of any witnesses to attest the same. 1 Roberts on Wills, 147, 148.

It is to be observed that the restrictions of that statute did not extend to wills made by any soldier being in actual military service, or any mariner or seaman being at sea. Moreover, as that statute did not extend to the provinces, and never has been adopted in this State, it is no part of our *common law*, although we have statutory provisions in many respects similar, and some of them directly copied from it.

The validity of wills of personal estate, then, is to be determined by the rules and principles of the common law in this State, except so far as it has been changed by our own statutes. And by R. S., c. 74, § 18, soldiers in actual service or mariners at sea are so far relieved from the formalities to be observed by others in the making of their wills, that, either by written will or by nuncupation, they may dispose of their personal estate and wages as they might have done under the common law.

It is true that, since the mass of the people have grown more familiar with the use of the pen, nuncupations have deservedly fallen into disfavor, as being more likely to be the subjects of fraud, perjury, mistake or misrecollection. And in fact it was an attempt to establish a will of this sort, (in the case of *Cole* v. *Mordaunt*, given in note to 4 Vesey, 196,) by means of gross fraud and perjury, that brought about the enactment of the statute 29 Car. 2, c. 3, commonly called the Statute of Frauds, to which we have before referred. And now, in England, by statute, (1 Vict., c. 26,) and in Massachusetts, (General Statutes, c. 92, § 9,) and in New York, by the revised code, the right to make nuncupative wills is confined strictly to the soldier in actual service and the mariner at sea. As to any one belonging to either of these privileged classes, the right to dispose of his personal estate and wages still remains substantially as

under the civil law in the days of Justinian. " *Quoquo enim modo voluntas ejus suprema inveniatur, sive scripta, sive sine scriptura, valet testamentum ex voluntate ejus.*"

And in our State, under R. S., c. 74, § 18, nuncupations may still be made by other citizens under restrictions which have long obtained, and which it is unnecessary in this case to discuss. For whatever may be said of the extraordinary caution which should be exercised by the Courts in the establishment of *nuncupative* testaments, an olographic will, like the one before us in the present case, stands upon a quite different footing, and, proof of its authenticity being made, the main question is, — was the position of the writer such that he might lawfully make a will without observing the customary formalities?

The privileged military testament was first recognized when the army under Julius Cæsar became the ruling power in Rome. As finally confirmed and limited by the edicts and rescripts of that great lawgiver and succeeding emperors, the privilege granted was, (as appears in Cooper's Justinian, Lib. II, Tit. XI., page 118, *et seq.*,) substantially *this*. The strict observance of formalities in the construction and execution of testaments was dispensed with in favor of all military persons, — *propter nimiam imperitiam eorum*, — on account of their unskilfulness in these matters. (Note here the *reason why* the privilege was conferred.) "For although they should neither call the legal number of witnesses nor observe any other solemnity, yet they may make a good testament," — *videlicet, cum in expeditionibus occupati sunt*, — that is to say, " when they are in actual service ;" " but when soldiers are not upon an expedition, and live in their own houses or elsewhere, they are by no means entitled to claim this privilege." And again : — " This privilege was granted by the imperial constitutions to military men to be enjoyed," — *quatenus militant et in castris degunt*, — " only during actual service and while they lived in tents. For, if veterans after dismission, or soldiers *out of camp*, would make their testaments, they must pursue the

forms required" of other citizens. "And if a testament be made in camp, and the solemnities of the law are not adhered to, it will continue valid only a year *after dismission from the army.*"

"Officers of the army and soldiers, who are actually in an expedition and not in a condition to observe all the formalities which the law requires in testaments, are relieved from observing those which their present state does not allow them to comply with." Domat's Civil Law, vol. 5, p. 296.

And such substantially is the privilege granted to the soldier under our laws, *propter nimiam imperitiam ejus,* and while he is in such a position that it cannot be reasonably presumed that he might obtain instruction from those learned in the law.

What now is the true meaning of the phrases "engaged in an expedition," "in actual service," (for the decisions recognize them as synonymous)?

That there must be actual warfare, in the prosecution of which the soldier is at the time engaged, is clear.

The will of a soldier, made while he is quartered in barracks at home, must be executed with the formalities required of others. *Drummond* v. *Parish,* 3 Curteis, 522.

And the same is true if, having left home, he is thus quartered in a peaceful colony. *White* v. *Repton,* 3 Curteis, 818.

*So;* where an officer in command of the Mysore division of the army stationed at Bangalore, a large and strongly fortified town in Southern India, made his will at that place; though he died while on a tour of inspection of the troops under his command. *In the goods of Hill,* 1 Robertson, 276.

And, in the case from 1 Spink's Eccles. & Ad. Reports, 294, *Bowles* v. *Jackson,* which, with such as those just before referred to, plaintiff's counsel claims as decisive in his favor, where the deceased, a captain in the infantry stationed with his regiment at Neemuch in Bombay in 1839, received orders, August 14, to march on August 22, to attack the citadel of Joadhpore, and thereupon made his will,

August 20, duly signed but attested by only one witness, and set out, August 22, upon the expedition as commanded, from which expedition he never returned, dying October 13, at Musserabad, it seems to have been held that the military privilege did not apply; that the officer could not be said to have been *in expeditione* when the will was made; that the orders to march were not immediate; that the deceased had full time to make and did make a will, but unfortunately not in accordance with the requisites of law, and therefore the will was rejected. We have not had access to the volume referred to, and accept the citation as made by the diligent and learned counsel, but it is manifest that the value of that case, as an authority in the present, may depend upon historical and topographical facts not here stated. If the English court viewed Jackson's will as having been made in the peaceful presidency of Bombay, the oldest of the British possessions in India, at Neemuch, where there was a regular cantonment of British troops, many leagues from the contemplated scene of hostilities, and before he departed to take part in the Affghan war, (which broke out in 1839,) or in some movement of the troops designed to quell the insubordination of some petty and distant Rajah, although he was under orders to march at a future day, the case would be simply consonant with *White* v. *Repton*, and other cases which establish beyond question the doctrine that the soldier must be engaged in an actually existing warfare, and not merely belong to a garrison or standing army not employed in hostile operations.

Doubtless if Leathers had written this letter after he had been mustered into the service of the United States, but while he remained in barracks at Augusta, or while thus quartered at any permanent military depot or station in one of the loyal States not exposed to the incursions of the enemy, before he had crossed over into Virginia with his regiment to take part in the hostilities existing there, and before he had begun to move under military orders against

the foe, we should feel bound to say that this was no valid will and that it is not entitled to probate as such.

But having marched into the enemy's country, from which he never returned, being encamped among a hostile population, and acting in conjunction with soldiers who were confronted by the rebel army, although he was in winter quarters, and not at the time of writing occupied with any present movement of the troops, but was apparently on some service detached from his own regiment, we cannot say that he was not a soldier *in actual service, engaged in the great expedition* which cost so many lives, but which after long delays resulted in reëstablishing the authority of the government over the revolted States. The term expedition is not to be confined to that movement of the troops which immediately precedes the actual conflict and shock of battle.

To limit the soldier's privilege to those excursions from camps or quarters in the enemy's country which are designed to bring on an immediate engagement, would be to defeat it for the most part, except as to mere nuncupations, the proof of which resting in the breasts of those who are similarly exposed may never be made available to the soldier's friends.

A member of the First Maine Cavalry, in camp at Stafford Court House, the deceased was " in actual service" and " engaged on an expedition," though the orders to saddle, mount and ride on the raid toward Richmond, upon which he was taken prisoner, were not received until months afterwards. *Propter nimiam imperitiam ejus,* and because he was in no condition to learn and observe the formalities elsewhere required, *valet testamentum ex voluntate ejus.*

And the military testament is not to be confounded with merely nuncupative dispositions made by those not privileged as soldiers in actual service, or mariners at sea. And so the argument which the counsel for plaintiff bases upon the statements in the letters as to the health and good corporeal condition of the writer, and upon the length of time

that elapsed after the date of the alleged will before his death, cannot avail. If he belonged to the privileged class he might make a valid written testament without being *in extremis*. Whether a nuncupative will made under like circumstances would be good, it is unnecessary here to decide. We have seen that wills made under such circumstances that the privilege attaches are held valid for a year after the soldier quits the service. Leathers remained in the service till his death, and, so far as appears, was a dweller in camp until he became a prisoner.

While it is true that the policy of the law is well settled to regard wills as inoperative unless executed with the formalities which the law requires as safeguards against imposition, it is also true that the exemption of soldiers in actual service and seamen at sea from the observance of these formalities has always been liberally considered; and so it is, as MERLIN states it, that "*their* form was properly to have no form."

Thus where a surgeon in the East India Company's service returned from England to join his regiment in India, in medical charge of recruits, and in July, 1838, when on board ship at Portsmouth, wrote a paper of a testamentary character, but appointing no executor or residuary legatee, and which was moreover unattested, it was determined that administration with the paper annexed passed to the mother of the deceased. *In re Donaldson*, 2 Curteis, 386. And a letter written by an invalided surgeon on his return home on board the regular line of steamers, addressed to his brother, and containing a disposition of his property, was admitted to probate as the will of a seaman made at sea, the writer having died before he reached England. *In re Saunders*, 11 Jurist, N. S., 1827.

See also, *Hubbard* v. *Hubbard*, 4 Selden, 196; *In the goods of Lay*, 2 Curt., 375; *exparte Thompson*, 4 Bradford's Surrogate Reports, 154, for examples of cases, where the privilege was held to attach as to seamen *at sea*.

In consonance with authorities of this description, and

adopting a like liberal construction in behalf of those who went forth in defence of our country in her recent great peril, we cannot hesitate to say that the paper here produced as the will of John B. Leathers must be considered as the privileged testament of a soldier in actual service, and engaged upon an expedition, and that, as such, it is entitled to probate.

In conformity, then, with the stipulations in the report, the entry in this case must be

*Plaintiff nonsuit, without costs.*

Appleton, C. J., Cutting, Kent, Dickerson, and Tapley, JJ., concurred.