## PIERCE ET AL. *v.* PIERCE.

NUNCUPATIVE WILL.—Nuncupative wills are to be restricted to cases falling clearly within the reason of the statute.

SAME.—*Soldier.*—A person who had enrolled himself in a volunteer company, raised under a call by the Governor for troops in 1862, but had not been accepted and mustered into the service, could not make a nuncupative will as a soldier.

SAME.—Real estate cannot be devised by the nuncupative will of a soldier.

CONSTITUTIONAL LAW.—When a statute has been held unconstitutional by the Supreme Court, it is inoperative while such decision is maintained; but a later decision sustaining such statute gives it vitality from the time of its enactment, and it is to be treated as having been constitutional from the beginning.

SAME.—*Descents.*—The Act of March 4th, 1853, dividing the property of an intestate, in certain cases, between his parents and his widow, was treated as unconstitutional under the ruling in *Langdon* v. *Applegate,* 5 Ind. 327; but the case of *The Greencastle Southern Turnpike Co.* v. *The State, ex rel. Malot,* 28 Ind. 382, established its constitutionality; and the property of an intestate who died between March 4th, 1853, and the repeal of said statute by the act of March 9th, 1867, descended according to its provisions, and a right thereunder might be asserted, where suit was brought within the time limited by the act of 1867.

From the Tippecanoe Common Pleas.

*J. A. Stein, M. Jones, J. L. Miller,* and *W. C. Wilson,* for appellants.

*H. W. Chase* and *J. A. Wilstach,* for appellee.

DOWNEY, J.—The appellee sued the appellants, and had judgment in her favor. The questions presented relate to the sufficiency of the complaint, and the correctness of the ruling of the court in refusing to grant a new trial on the motion of the appellants. The points in question are such that it is not necessary to set out the pleadings, or to state the reasons for a new trial at length, in order to understand them.

The complaint was against Lydia Pierce, the widow of James M. Pierce, deceased, and Mark Jones, the administrator of his estate. Sarah Pierce, the appellee, is the mother of the deceased. The deceased died intestate, as alleged, in 1862, leaving his mother, his only surviving parent, and said Lydia, his widow, but leaving no issue or the

descendants of issue surviving him. He left a considerable estate, real and personal, which, if he died intestate, was inherited by his widow and his mother. The widow claimed to be the owner of three-fourths of the estate, and conceded that the mother was the owner of the other one-fourth, if the deceased died intestate. The parties had united in conveying certain real estate which they thus inherited, and the widow had received three-fourths and the mother one-fourth of the proceeds. The widow had also, as was alleged, received and retained rents of real estate, and large amounts of money from the administrator, while he had failed to pay any part of the money to the plaintiff. The plaintiff claimed that she was entitled to one-half of the estate, and made her demand upon the administrator that he pay the same to her, which he refused to do, and wholly refused to recognize her claim, etc. The object of the action was to settle the respective rights of the parties in the estate, and to compel an accounting accordingly. The action was commenced June 6th, 1867.

In addition to a denial of the complaint, the defendants set up a claim to the whole of the estate in favor of the widow and one Antha Kellogg, who had been raised by said Pierce, although not adopted according to law. This claim was based on an alleged nuncupative will which it was averred had been made by the deceased, when a soldier of the United States in the war to suppress the rebellion, just as he was upon the point of leaving home in such service, and while in possession of the property set forth in the complaint; that he then verbally published as his will, in case of his death in said service, that all his property should descend to, and be equally divided between, said defendant and said Antha Kellogg; that said Pierce immediately thereafter died in said service, while a soldier as aforesaid.

It may be considered, first, whether the alleged nuncupative will is valid or not; and, second, if it is not valid, what are the legal rights of the parties in the estate?

The evidence relating to the nuncupative will was as follows:

William B. Brittingham testified: " I was a resident of Lafayette in 1862, and engaged in the practice of medicine; I knew the deceased from 1858 until his death, and was his family physician from 1859, and was otherwise intimate with him; he came to my office to read his newspapers and private papers almost daily, for six or eight months before his death; he enlisted on the 21st day of July, 1862, as nearly as I can recollect the date; at all events, it was on the Monday the company left Lafayette, Indiana; this was G. S. Orth's company; he told me he had enlisted, and I saw him start away in the ranks afterward; he came to my office about 11 o'clock on the Monday morning referred to; he stated to me that he had enlisted and was going to the front immediately, and wished to place some matters in my hands to look after; he said he wished me to say to his wife that he wanted Antha, his adopted daughter, now Mrs. Ridgely, to have the half of his property; he explained himself by saying he wanted his wife and Antha to have all his property; it belonged to them, and they had the right to it; he came to me as an old friend, not knowing that he would ever see them again; wished me to see this matter executed, and to go and tell Mrs. Pierce, in case of his death; he said that he had a presentiment that he would never come back alive; I told him I did not want to take the responsibility of it; that he had better make this in writing; his answer was this, that the property belonged to them, and that there could be no trouble; also, that he had not time to do it; I made a minute of it at the time on a piece of paper; I think I have never looked at it from that time to this; I have not given his exact words, but this is the substance of it; he also requested me to look after his wife, and advise her as to property, and to see that his adopted daughter was properly protected; he left the same day about noon, I think on the Indianapolis railroad, in G. S. Orth's company, to go to the front and help defend Kentucky.

Samuel A. Huff testified, that he had been well acquainted with the deceased; that on the morning of Sunday the 20th day of July, 1862, a telegram was received at Lafayette from Governor Morton, announcing an invasion of Indiana, by rebels who had crossed the Ohio, and calling for volunteers; this telegram produced great excitement in Lafayette; it was read in the churches during morning service, and in the course of the afternoon a public meeting was held at the court-house, at which two companies of volunteers were organized, one commanded by the witness, and one by G. S. Orth; these companies left the next morning about seven o'clock for Indianapolis, and the witness recollects being in the same car with the deceased, in going thither; the two companies were sworn into the United States service the same day at Indianapolis, and at once proceeded to the Ohio river by railroad. He was informed subsequently that on Tuesday, the day after they left Indianapolis, the deceased was accidentally drowned in the Ohio river, having missed the gangway in going on or off the boat, which was being used by the company; he belonged to Captain Orth's company. The excitement in Lafayette connected with the organization of these companies lasted throughout the entire Sunday, and up to the time of departure next morning; a large multitude accompanied the volunteers to the cars as they left.

Mark Jones testified that he knew the deceased during his lifetime, and that he remembers meeting him on the morning of the 21st of July, 1862, about half past seven o'clock, on Main street in Lafayette, and that deceased then told him he had enlisted in Captain Orth's company, and was then on his way to the cars to go with his company to Indianapolis.

The sections of the statute bearing on the question are sec. 20, p. 555, and sec. 21, p. 556, 2 G. & H. They read as follows:

"Sec. 20. No nuncupative will shall be valid when more than the value of one hundred dollars is bequeathed, nor

unless it be made in the last sickness of the testator, and the subject thereof is reduced to writing within fifteen days after it shall have been declared and proved by two competent witnesses, who shall have heard the testator in effect request. some of those present to bear witness thereto, and no such nuncupative will shall be proved after six months from the death of the testator, nor until his widow and heirs shall have reasonable notice of the time and place of proving the same.

"Sec. 21. Nothing contained in this article shall prevent. any soldier, in actual military service, nor any mariner, at sea, from disposing of his personal estate, in his actual posses-- sion, and his wages, by a nuncupative will."

The language of both of these sections evinces an intention on the part of the legislature to restrict nuncupative wills to cases falling clearly within the reasons of the statute. Under section 20, property bequests cannot exceed one hundred dollars in value. The will must be made in the last sickness of the testator. It must be reduced to writing within fifteen days after it shall have been declared, and must be proved by two competent witnesses, who must have heard the testator, in effect, request some of those present to bear witness thereto. It cannot be proved after six months from the death of the testator, nor until his widow and heirs have had reasonable notice of the time and place of proving the same.

Counsel for appellant concede that under section 20 the will cannot be upheld, but claim that it is valid as a soldier's will under section 21.

Two classes of persons are authorized to make a nuncupative will by section 21; soldiers, in actual military service, and mariners, at sea. These persons may dispose of their personal estate, in their actual possession, and their wages, by nuncupation. Was the deceased in this case in actual military service? In *VanDeuzer* v. *The Estate of Gordon,* 39 Vt. 111, the soldier in September, 1862, enlisted and joined his company and regiment in camp at Worcester,

Mass., was then mustered in, and soon after, while still there, wrote and signed an instrument which was defectively executed as a will, but intending the same to be his last will and testament, provided he died during his term of enlistment. Before the expiration of his term, he died without having been discharged or mustered out. It was held, that the soldier was not in actual military service, and that the will was not valid as a soldier's will. WILSON, J., in delivering the opinion, said: "The term service, in its general sense, embraces all the details of the military art. In this sense of the term Gordon was in military service at the time he wrote and signed the instrument. He was subject to all the laws and regulations for the government of a soldier who had enlisted for the purpose of joining a certain company and regiment. He was in camp under instruction in military drill and discipline, and performing such other service as might be required of a soldier before his company and regiment were accepted and mustered into the principal service for which they were to be organized. The term service, in its restricted sense, is the exercise of military functions in the enemy's country in the time of war, or the exercise of military functions in the soldier's own state or country in case of insurrection or invasion, and in this sense the words of the statute, 'actual military service,' should be understood. The exception of the statute, in respect to soldiers' wills, is founded upon the necessity of the case. It is limited to cases where from the actual or supposed situation of the soldier he is exposed to the perils incident to actual warfare. It is clear that such was not the situation of Gordon at the time he made the instrument, and that he was not in condition while at Worcester to make the soldier's will." In the case cited, Gordon had been regularly mustered into the military service of the United States, while in the case under consideration the deceased had not been so mustered. Judge Huff testifies that he was sworn into the service of the United States after reaching Indianapolis, on the day after the supposed nuncupative will was made.

In *Leathers* v. *Greenacre*, 53 Me. 561, the facts were, that Leathers enlisted in the First Maine Regiment of Cavalry, and was mustered into the service of the United States in August, 1862, and continued in the service until his death, which took place at Richmond, where he was held a prisoner by the rebels, March 16th, 1864. A few days after his enlistment, and before he left the State of Maine, he entrusted to the defendant two promissory notes, payable to himself, with written directions to collect them and let any one of his friends who needed them most have the proceeds, in case he gave no further directions. Afterward, when he was at Stafford Court-House, in Virginia, on the 6th of March, 1863, he wrote a letter to the party with whom he had left the notes, making a different disposition of them or their proceeds. In deciding the case, the court say: "Doubtless if Leathers had written this letter after he had been mustered into the service of the United States, but while he remained in barracks at Augusta, or while thus quartered at any permanent military depot or station in one of the loyal states not exposed to the incursions of the enemy, before he had crossed over into Virginia with his regiment to take part in the hostilities existing there, and before he had begun to move under military orders against the foe, we should feel bound to say that this was no valid will and that it is not entitled to probate as such.

"But having marched into the enemy's country, from which he never returned, being encamped among a hostile population, and acting in conjunction with soldiers who were confronted by the rebel army, although he was in winter quarters, and not at the time of writing occupied with any present movement of the troops, but was apparently on some service detached from his own regiment, we cannot say that he was not a soldier in actual service, engaged in the great expedition which cost so many lives, but which after long delays resulted in re-establishing the authority of the government over the revolted states. The term expedition is not to be confined to that movement of the troops which

immediately precedes the actual conflict and shock of battle."
See, also, *Gould* v. *Safford's Estate*, 39 Vt. 498.

In 1 Redfield on Wills, 190, it is said : "The privilege
extended to soldiers being limited to such as are ' in actual
military service,' questions have sometimes arisen as to what
is implied by these terms.　The rule of the English ecclesi-
astical courts is, that it was intended to include only such as
are on an expedition, or, in the language of the Roman law,
'*in expeditione.*'　Hence it has been there decided, that the
will of a soldier quartered in barracks, either at home, or in
the Colonies, is not within the concession.　And the same
rule was applied to an officer, while in command of one of
the divisions of the army in the East Indies, and who died
whilst on a tour of inspection of the troops."

Counsel for appellant refer to the case of *In the Goods of
George Thorne*, 11 Jur., N. S. 569, as an authority in point
in favor of the allowance of the will in this case.　Thorne
was a captain in the regular army, in the 4th West India
Regiment of Infantry, and by order of the military authori-
ties proceeded with his regiment to the Gold Coast, Africa,
to join an expedition intended to march into the interior
against the king of Ashantee; before the expedition had
actually started from the British settlement, he wrote a tes-
tamentary paper, but did not execute it in the presence of
two witnesses.　It was held, that the testator was at the time
on actual military service, and that the paper must be admit-
ted to probate.　This case is clearly distinguishable from
that which we are considering.　There the deceased was an
officer in the regular army, had been and was in regular
military service, and was about to engage in an expedition
against the enemy.　Here the deceased was not in the mili-
tary service of the United States.　He had not taken any
steps which made him a soldier in any proper sense of the
word.　Had he refused to be sworn on arriving at Indian-
apolis, he could not have been considered bound by anything
which he had done, nor compelled to be sworn or to enter
into actual military service.　We are of the opinion, then,

Pierce *et al. v.* Pierce.

that he was not only not in actual military service, but that he was not even a soldier while yet at Lafayette, within the meaning of the statute in question.

A portion of the estate of Pierce was real estate. By the section of the statute in question, only personal property can pass by a soldier's will. See, also, *Palmer* v. *Palmer*, 2 Dana, 390 ; *McLeod* v. *Dell*, 9 Fla. 451 ; *Smithdeal* v. *Smith*, 64 N. C. 52.

A question not discussed arises, and that is, whether, if this alleged nuncupative will had been made under such circumstances that it might have been admitted to probate, it must not, like any other will, have been admitted to probate. in the proper court before it could be pleaded or used in evidence as a will.

And again, it is only the personal estate, in actual possession of the soldier, which he can dispose of by nuncupation. The personal estate which it is claimed the deceased bequeathed in this case consisted of goods, wares, merchandise, moneys, notes, accounts, and other choses in action. Although these were, in one sense, in the possession of the deceased at the time, it may be a question whether they were in his "actual possession," within the meaning of the statute. We need decide nothing on this point, however.

The next point is, what are the legal rights of the parties in the estate? The question here may be stated as follows:

By section 25 of the statute of descents of 1852, 1 G. & H. 296, three-fourths of the property in this case would have descended to the widow. But by an act approved March 4th, 1853, Acts 1853, p. 56, sec. 3, the above section 25 is so amended as to divide the estate equally between the widow and mother. Until the spring of 1867, it was believed among the profession that the amendment of 1853 was unconstitutional, because it failed to recite the section amended. The administrator, Jones, conducted his distribution of the estate accordingly under the act of 1852. On the 9th of March, 1867, the act "for the repeal of statutes not in conformity with the ruling of the Supreme Court in the

case of *Langdon* v. *Applegate* and others, and limiting actions arising out of the same," etc., was approved and became a law. 3 Ind. Stat. 573. It was followed in the ensuing November by the decision of this court in the case of *The Greencastle Southern Turnpike Co.* v. *The State, ex rel. Malot,* 28 Ind. 382, establishing the constitutionality of the above act of 1853. Before the three months' limitation provided by the act of 1867 expired, suit was brought in the present case by the appellee to recover her full half interest in the estate of her deceased son.

The point made by counsel is, "that when the decision in *Langdon* v. *Applegate,* 5 Ind. 327, declared the unconstitutionality of the act of 1853, and acts of like form, the same stood abolished, and private rights obtained their *status,* and became vested as if such unconstitutional and void acts had never been passed."

It is understood that the reason for the passage of the act of March 9th, 1867, was, that the judges of the court then on the bench had come to the conclusion that the ruling of the court in *Langdon* v. *Applegate* was wrong, and that by the enactment of that law much of the mischief which would result from overruling that case, and those which had followed it, would be prevented. The consequence of the overruling of these cases was, that the statutes which, according to the rulings therein, would have been held unconstitutional, were valid, not from the time of overruling those cases, but from the time of their enactment until they were repealed. It was not the overruling of those cases which gave validity to the statutes; but the cases having been overruled, the statutes must be regarded as having all the time been the law of the State. This court has no power to repeal or " abolish " statutes. If it shall hold an act of the legislature unconstitutional, while its decision remains, the act must be regarded as invalid. But if it shall afterward come to the conclusion that its former ruling was erroneous, and overrule it, the statute must be regarded for all purposes as having been constitutional and in force from the begin-

ning, and the rights of parties must be determined accord-
ingly. The act of March 4th, 1853, having been valid, and
the deceased having died while it was in force, his estate
must, according to its terms, be divided equally between his
widow and his mother. It will be understood, we presume,
that we decide the case upon its own facts. The parties
claiming the estate each assert a claim by virtue of the stat-
ute of descents. We decide nothing as to what would be
the rule, had the parties to whom the estate descended con-
veyed the same before the case of *Langdon* v. *Applegate* was
overruled, and had the purchaser been the party assert-
ing a claim.

The judgment is affirmed, with costs.