In the Matter of Proving the Last Will and Testament of JEROME F. DUMONT, Deceased, as a Will of Real and Personal Property.

HELEN POWERS, Proponent, Appellant; JOHN J. BENNETT, JR., Attorney-General of the State of New York, and Others, Respondents.

Decree affirmed, with costs to the respondents payable out of the estate. No opinion.

Present — Martin, P. J., Glennon, Untermyer, Dore and Cohn, JJ.; Untermyer, J., dissents in opinion. [170 Misc. 100.]

UNTERMYER, J. (dissenting). Jerome Francois Dumont, the decedent soldier, a resident of California, enlisted at Fort McDonald, California, for the First Separate Squadron, Cavalry, California National Guard, a military unit then in Federal service and later designated Company C, 145th Machine Gun Battalion. He was transferred on June 1, 1918, to an infantry replacement detachment, and left the United States for overseas service on June 28, 1918. Assigned on August 11, 1918, to Company B, 127th Infantry, he served with that regiment in the Fismes defensive sector, participated in the Oise-Aisne offensive and was wounded in action on August 31, 1918.

In a hospital in France, Dumont made the acquaintance of a fellow soldier named Powers. They formed a close friendship, and Powers invited Dumont to visit his home on his return to New York. At the same time he wrote to his family to that effect.

Dumont was sent from France before the Armistice was signed. On his return to the United States on November 14, 1918, he was first stationed at Ellis Island, in New York Harbor. While there, he frequently visited the home of the petitioner, Miss Helen Powers, a sister of his friend in France. At a dinner at her home about Thanksgiving, 1918, they announced their engagement to marry and at the same time Dumont stated to the assembled guests that, " if anything should happen to him when he rejoined his outfit," everything should go to his *fiancee.*

Some time in December, 1918, Dumont was transferred to Whipple Barracks, Arizona. On December 22, 1919, he was honorably discharged from the military service on a surgeon's certificate of disability. He died in California on January 20, 1920. While in California, he repeated to various persons his desire that everything he might leave should go to Helen Powers and, two days before his death, he executed an instrument changing the beneficiary under his War Risk Insurance from his estate to his *fiancee.*

This insurance is the only asset in his estate. Payment has been refused by the Veterans' Administration on the ground that the beneficiary is not within the class specified in the War Risk Insurance Act, although the Director of Insurance is

prepared to make payment " if it can be shown that there are living persons who will prevent an escheat, or in the event that a letter of the veteran's can be probated as his will." The evidence shows that Dumont had no living relatives at the time of his decease, so far as he knew and so far as can be ascertained. His estate will be forfeited if his oral will is not admitted to probate, because " in cases where the estate of an insured would escheat * * * the insurance shall not be paid." (World War Veterans Act, § 303; U. S. Code, tit. 38, § 514; *Fennell* v. *United States*, 67 F. [2d] 768; *Brown* v. *United States*, 65 id. 65.)

This proceeding then became necessary to test the validity of the decedent soldier's unwritten testament. The surrogate was entirely satisfied of the truth of the testimony concerning Dumont's declarations, made in the latter part of November, 1918, and that they were established by two witnesses (Surr. Ct. Act, § 141), but denied probate on the authority of *Matter of Grey* ([1922] P. 140), holding that the decedent at the time of these declarations was not in " actual military service " within the meaning of section 16 of the Decedent Estate Law.

The statute under consideration, unlike statutes of some other States which require that the soldier must be in " actual contemplation, fear or peril of death " (N. D. Comp. Laws Ann. 1913, § 5645; Okla. Comp. Statutes, 1921, § 11226; Mont. Rev. Codes, 1921, § 6992) before he can execute a valid nuncupative will, provides as follows: " No nuncupative or unwritten will, bequeathing personal estate, shall be valid unless made by a soldier while in actual military service * * *." This language follows a similar English statute. (29 Car. II, ch. 3, § XXIII.) It contains no statutory definition of " actual military service," but that term has been the subject of considerable judicial interpretation. (*Matter of Smith*, 6 Phila. [Pa.] 104.)

The statutory test, it should be observed, is not the difficulty that may exist in preparing or causing to be prepared a valid written will. If it were, very different considerations would apply. Situations may readily be imagined where a soldier, though in " actual military service " even at the front, could readily execute or arrange for the execution of a written will. Nevertheless, his oral will, under the principle declared by all the authorities, would be valid (*Matter of Mallery*, 127 Misc. 784; affd., 220 App. Div. 794; affd., 247 N. Y. 580), even though he might happen to be an attorney or that an attorney was immediately available. If, on the contrary, he is not in " actual military service," the soldier's oral will is not valid even though made under conditions which rendered impossible the execution of a written will. We must, therefore, consider the validity of Dumont's will in the light of the test created by the statute and not influenced by the question whether, under the particular circumstances which existed here, Dumont might or might not have found the means to execute a written will.

Earlier cases, decided at a time when warfare was local in scope and character, gave to the phrase " actual military service " a restricted interpretation, limiting application to those extreme situations where a soldier was on expedition or engaged in combat. A soldier quartered in regular barracks or at home on leave, though before departing for the scene of combat, was not deemed to be in actual military service which would enable him to make a nuncupative will. (*Van Deuzer* v. *Estate of Gordon*, 39 Vt. 111; *Gould* v. *Safford's Estate*, Id. 498; *Pierce* v. *Pierce*, 46 Ind. 86; *Leathers* v. *Greenacre*, 53 Me. 561; *Matter of Smith, supra*; *Bowles* v. *Jackson*, 1 Spinks' Ecc. & Ad. 294; *Matter of Hill*, 1 Robertson's

Ecc. 276; *White* v. *Repton*, 3 Curt. 818.) In *Matter of Grey* (*supra*), on which the surrogate relied, probate was denied to a paper dated May 9, 1921, offered as the will of the decedent soldier made while in a battalion in barracks at London. Almost two years before, Great Britain had ratified the Treaty of Versailles (July 31, 1919), even though there had been no official proclamation of the conclusion of the war. The decision followed the early case of *Drummond* v. *Parish* (1724) (3 Curt. 522), in which it was decided that the will of Drummond, a Major-General, was not made in war time.

More recent cases have decided that a soldier is in actual military service for the purposes of making an unwritten will, when he has been mobilized for service and assigned to duty, whether a state of war exists or is imminent. (*Gattward* v. *Knee*, [1902] P. 99; *Matter of Hiscock*, [1901] P. 78; *Matter of Booth*, [1926] P. 114; *Matter of Gossage*, [1921] P. 194; *Matter of Stable*, [1919] P. 7.) In the *Gattward* case (*supra*) a soldier stationed in barracks at Calcutta, India, disposed of certain property by letter in which he stated " as we are just off for South Africa again for the Boer War — if war is declared at all." The letter was admitted to probate as his will on the ground that the mobilization order had been received even though no steps had been taken under it. (Compare *Matter of Anderson*, [1916] P. 49.) In another case the court said: " * * * for the purpose of determining whether the soldier is in actual military service, the commencement of the military service is the time when the mobilization takes place. In the same way it seems to me that the actual military service does not cease until the full conclusion of the operations." (*Matter of Limond*, [1915] 2 Ch. 240.)

"Actual military service" should not depend on the precise distance of the soldier from the firing line. During the World war thousands of soldiers were engaged in the service of supply and while their war service may never have brought them in contact with the enemy, their efficient co-ordination was essential to the success of military operations. They are not to be denied the soldier's privilege of making a nuncupative will because not directly a part of the combatant forces. This is particularly true under the extreme conditions of modern warfare requiring defenses against naval and air attacks on home territory.

A state of war existed during the entire period of Dumont's military service. For the United States it continued until July 2, 1921, when Congress passed the joint resolution declaring the war with Germany at an end. (*Kahn* v. *Anderson*, 255 U. S. 1; *Vincenti* v. *United States*, 272 Fed. 114; *Matter of Miller*, 281 id. 764.) Especially in the light of the military definition of active service, Dumont was in actual military service at the time he made the nuncupative will. Under the terms of the Armistice, an American Army of Occupation at that moment was on the march into Germany, and did not cross the Rhine until about December 1, 1918, a few days after the Thanksgiving dinner at which Dumont made the will. The duration of the Armistice, which had been executed on the morning of November 11, 1918, was for thirty days, with option to extend, but it could have been denounced upon notice of forty-eight hours if its clauses were not carried into execution.

No one could have predicted in November, 1918, whether the Armistice would be of temporary duration or would become permanent and result in a treaty of peace. If hostilities had been resumed, Dumont, a soldier with battle experiences, might immediately have been ordered to front line service in France. In Novem-

ber, 1918, and for several months after the Armistice, expeditionary forces of the American Army remained in Russia and Siberia, where engagements occurred with numerous casualties.

At the time Dumont made his unwritten will he was subject to war time discipline and the extreme penalties for offenses against the Articles of War and Army Regulations. Except for the existence of the war and his enlistment for active service in the army, he would not in November, 1918, have been three thousand miles from his home in California, making difficult, though not impossible, the preparation of a valid written will.

The decree should be reversed and the will of the decedent soldier should be admitted to probate.