## MARIA J. HUBBARD *against* ELIAS HUBBARD.

A nuncupative will may be made by a captain of a coasting vessel while she is on a voyage, and while lying at anchor in an arm of the sea where the tide ebbs and flows.

It is sufficient that the testator, in prospect of death, in answer to questions as to what disposition he desires to make of his property, states his wishes. No particular form of bequest is necessary, nor is it necessary for him to request any persons present to be witnesses that it is his will.

This was an appeal from a judgment of the supreme court in the second judicial district, reversing a judgment made at a special term, by which a decree of the surrogate of Suffolk county, establishing a nuncupative will of William L. Hubbard of Greenport was reversed. The facts which appeared in the case were as follows:

William L. Hubbard, the husband of the respondent, Maria J. Hubbard, and son of the appellant, was the captain and owner of the schooner Oregon of Greenport, Long Island. She had been to Philadelphia for a load of coal, and was on her return, lying at anchor on account of

Hubbard *against* Hubbard.

head winds, in the mouth of Delaware bay, inside the breakwater, about a mile from the main land, about that distance from the open sea, and three miles from the nearest place of settlement on shore. The tide here ebbs and flows about six feet. At this place, on the morning of the 5th of July, 1849, he was taken sick with Asiatic cholera, of which he died the same day at five o'clock in the afternoon. While suffering under his disease, about an hour before he died, and while of sound mind and memory, on being asked as to the disposition of his property, he stated in the presence of several witnesses that he "wished his wife to have all his personal property." Beckwith, the mate of the vessel, then asked him if he wished her to have his real property too, and he replied, " Yes, all." He was then asked if he had no will, and he replied that he had had one, but it was destroyed. He was then asked by the mate what he should tell his wife, and he replied, " Tell her I loved her till the end." He subsequently was asked by Beckwith who he wanted to settle his affairs, and he replied, " I want you to do it." He did not ask any one to bear witness that what he stated was his will. These conversations were proved before the surrogate by four witnesses, and he adjudged them a good nuncupative will.

Elias Hubbard, the father and heir at law of the decedent, appealed to this court.

*S. D. Craig* for appellant. A nuncupative will can be made only while the testator is at sea, languishing in fear of death, and when, being *in extremis,* he dare not wait to have his will written. (*Prince* v. *Hazelton,* 20 *John.* 502.) The witnesses are to be called upon by him, to bear witness that what he declares by words is his will. (1 *Bl.* 500.) They must agree when they reduce the will to writing in making the testator speak the same words, and the will must comply with the requirements of the statute in point of form, substance and number of witnesses. (*Eq. Ca. Ab.* 404, 2 *Bl.* 500.)

The case in question has not this train of essential requisites, because the supposed bequest was not by a mari-. ner, and if a mariner, not "while at sea," but anchored in a safe harbor, within the state jurisdiction, on a *coasting* voyage, within a mile of the shore, and three of a town.

The *words* are not of the supposed testator, but put to him by interrogatories, to which he answered by monosyllables.

What in fact took place was not at the request of the decedent; but the words were drawn from him by answering leading interrogatories. Beckwith states he said very little, and nothing of the disposition of his property until asked the question.

The persons accidentally present were not specially or otherwise called upon by the decedent to witness what he answered, or to bear testimony to his declarations that such was his will.

These omissions, amidst the train of other essential requisites to sustain an unwritten will, prove conclusively that he had not the *animus testandi*, or the then present intention to make his will, or that he made the replies imputed to him with such intention. The interrogatories and replies were to a future time of action, not to a present; what "he wished," but did not perform, and of which he said nothing but in compulsive answer to leading questions, amounting in fact to constraint.

*G. Miller* for respondent. The testator was a mariner at sea when he made the nuncupative will. A mariner is at sea within the meaning of the statute, if absent from home on a sea voyage, although he may be in a river or harbor when the will is made. Otherwise, if he should lose his life by the stranding of his vessel, he could not make his will after she struck the shore. This declaration was made in the prospect of death. It was made when asked what disposition he wished made of his affairs. It was not necessary that he should call upon the witnesses

to bear testimony. That was never required by the common law. No particular form of words was necessary at common law for either written or unwritten wills of personal property. The only question is, did the testator, in view of approaching death, declare his wish that his wife should have all his personal property, with the intent that she should have it after his death? The question is one of fact, and it was determined by the surrogate.

The opinion of the court was delivered by

MASON, J. It is provided in this state by statute that no nuncupative or unwritten will, bequeathing personal estate, shall be valid, unless made by a soldier while in actual service, or by a mariner while at sea. (2 *R. S.* 60, § 22.) As to the wills of soldiers in actual service, and mariners at sea, they are left entirely untrammeled by our statutes, and are governed by the principles of the common law. The exception in our statute of wills in favor of soldiers and mariners was taken from the 29 *Car.* 2, *Chap.* 3, and is precisely the same, and the same exception is retained in England by their new statute of wills. (1 *Vic. Chap.* 26, § 11.) The testator was a mariner within the meaning of the statute The courts have given a very liberal construction to this exception in behalf of mariners, and have held it to include the whole service, applying equally to superior officers up to the commander in chief as to common seamen. (2 *Curt. Eccl. R.* 338; 1 *Williams on Exec.* 97.) It has been held to apply to the purser of a man of war, and embraces all seamen in the merchant service. (*Morrell* v. *Morrell,* 1 *Hagg. R.* 51; 2 *Curt. R.* 338; 1 *Williams on Exec.* 97.) This will was made at sea. In legal parlance waters within the ebb and flow of the tide are considered the sea. (*Bouv. Law Dic. Title Sea; Angell on Tide Waters,* 44 to 49; *Gilpin's R.* 528; *In re Jefferson,* 10 *Wheaton R.* 428; *Baker* v. *Hoag,* 3 *Selden,* 561.) Lord Hale says the sea is either that which lies within the body of the county, or without it. That an arm or branch of the sea within

the "*fauces terræ*" where a man may reasonably discern between shore and shore is, or at least may be, within the body of a county, but that part of the sea which lies not within the body of a county is called the main sea, or ocean. (*Harg. Tract, Chap.* 4, *p.* 10; *Smith on the Const. of Statutes,* § 588.) He adds "that is *called an arm of the sea where the sea flows and reflows,* and so far only as the sea flows and reflows;" and in this he follows the exact definition given by the *Book of Assizes* 22; *id.* 93, and this is the doctrine recognized by the courts of this country. (*Gilpin R.* 524; *United States* v. *Grush,* 5 *Mason,* 290; *U. States* v. *Willberger,* 5 *Wheaton,* 76 *to* 94; *U. States* v. *Robinson,* 307, 1 *Gallis. R.* 626.)

The courts in England have gone to the utmost verge of construction in extending this exception in behalf of seamen. In a case which came before the prerogative court of Canterbury in 1840, when the deceased was mate of her Majesty's ship Calliope, and whilst the vessel was in the harbor of Buenos Ayres, he obtained leave to go on shore, when he met with a serious fall and was so severely injured that he died on shore a few days after. Immediately after the accident he wrote on a watch bill with a pencil, his will, and which was unattested, but which was cut out and certified to by the officers on board the ship, and the court held it a good will of a seaman at sea, and ordered it to probate. (2 *Curt. Eccl. R.* 375.) The common law doctrine in regard to nuncupative wills was borrowed from the civil law. (*Drummond* v. *Parish,* 3 *Curt. Eccl. R.* 522, 531, &c.) By the civil law the strict formalities, both in the execution and construction of nuncupative wills of soldiers was dispensed with, and although they should neither call the legal number of witnesses, nor observe any other solemnity, yet their testament was held good if they were in actual service. (*Justin. Lib.* 2, *Title* 11; 1 *Lomax on Exrs.* 40.) The civil law was extremely indulgent in regard to the wills of soldiers. If a soldier wrote any thing in bloody letters upon his

shield, or in the dust of the field with his sword, it was held a good military testament. (1 *Bl. Com.* 417; 1 *Lomax. on Exrs.* 40, 41.) The common law, however, has not extended this privilege so far as the civil. (1 *Bl. Com. supra.*) Blackstone says that soldiers in actual military service may make nuncupative wills and dispose of their goods, wages and other personal chattels without those forms, solemnity and expenses which the law requires in other cases.

The rules, however, which are to be observed in making wills by soldiers and mariners are the same by the common law, and yet it must be confessed that the formalities which are necessary to be observed in the making of wills by soldiers and seamen are not defined with any very satisfactory precision in any of the English elementary treatises upon the subject of wills. Swinborne says that those solemnities only are necessary which are *juris gentium*. (*Swinborne pt.* 1, § 14.) Before the statute the ecclesiastical courts to whose jurisdiction the establishment of personal testaments belonged, required no ceremonies in the publication thereof, or the subscription of any witnesses to attest the same. (1 *Roberts on Wills*, 147.) A will of personal estate, if written in the testator's own hand, though it had neither his name nor seal to it, nor *witnesses present at its publication*, was held effectual, provided the hand writing could be proved. (1 *Roberts on Wills*, 148.) And so if written by another person by the testator's directions, and without his signing it, it was held good. (*Id.* 148.) It is laid down in books of very high authority that a nuncupative testament may be made not only by the proper motions of the testator, but also at the interrogation of another. (*Swinborne on Wills*, part 1, § 12, *p.* 6; *Lomax on Exrs.* 38; 1 *Williams on Exrs.* 102.) And Swinborne says, "*As for any precise form of words, none is required*, neither is it material whether the testator speak properly or improperly, so that his meaning appears," (2 *Swinborne, part* 4, § 26, *p.* 643;) and he says concerning the

SEL. IV.—26.

solemnities of the civil law to be observed in the making of testaments, soldiers are clearly acquitted from the observation thereof, saving that in the opinion of divers writers, soldiers, when they make their testaments, ought to require the witnesses to be present. ( 1 *Swin. part* 1, §14, *p.* 94.) It is necessary, however, that the testamentary capacity of the deceased and the *animus testandi* at the time of the alleged nuncupation should be clearly and satisfactorily proved in the case of nuncupative will. ( 1 *Williams on Exrs.* 102; 1 *Adams Ecc. R.* 389, 390.)

In the present case the evidence most clearly shows that the deceased was of sound mind and memory, and I think the evidence in the case satisfactorily establishes the *animus testandi* at the time of the alleged nuncupation. He told his mate Beckwith to tell his wife that he loved her till the end. He was extremely sick, and undoubtedly apprehending death, and when asked if he had a will, he replied that he had not, and on being asked what disposition he wished to make of his property, he said he wished his wife to have all of his personal property, and at the same time requested Beckwith to settle his affairs and see to his business. It should be borne in mind, that as well the testator as all of the witnesses present were seamen, and were undoubtedly acquainted with the rights of mariners in regard to making their wills. They evidently understood it to be a will, and spoke of it as such. And I think the *animus testandi* is satisfactorily established. The evidence is quite as strong in the case under consideration as it was in the case of *Parsons* v. *Parsons*, (2 *Greenleaf's R.* 298, 300,) where the testator was asked to whom he wished to give his property, and replied, " to my wife, that is agreed upon," and the supreme court of Maine sustained the will in that case. I am aware that it is said in some of the books that it is essential to a nuncupative will that an executor be named. but this is no more essential than in a written will. (*Rolle's Abr.* 907, *How* v. *Goodfrey, Finch's R.* 361; 20 *J. R.* 522.)

Hubbard *against* Hubbard.

I am inclined to think, however, that the evidence is sufficient, in the present case, to show that the testator intended to make Beckwith his executor, but it is not necessary that he should have named one.

It is not necessary to decide whether the mariner must make his will in his last sickness and *in extremis*, as was held to be the case under our former statute of wills, (20 *J. R.* 503,) and as is required under the statutes of several of our sister states; (4 *Watts & Serg*, 357; 4 *Humph. R.* 342; 3 *B. Monroe's R.* 162; 4 *Rawle R.* 46; 6 *Watts & Serg*, 184; 3 *Leigh. R.* 140; 1 *Munf. R.*, 466; 6 *B. Monroe R.* 538; 10 *Yerg R.* 501; 2 *Greenleaf's R.* 298;) for there can be doubt upon the evidence in this case, but this will was made both *in extremis* and in the last sickness, and under circumstances which precluded the making of a written will.

I think that the *factum* of this nuncupative will is clearly established by the evidence in the case, and also the testamentary capacity of the deceased, and that the *animus testandi* at the time of the alleged nuncupation is sufficiently apparent from the evidence in the case, and that the judgment of the supreme court should be affirmed.

Judgment affirmed.