## Ex parte, Thompson.

*In the matter of proving the last will and testament of* George Thompson, *deceased.*

Nuncupative wills at common law were as valid in respect to personal estate as written testaments ; and, although originally not required to be made at any particular time. it eventually became settled doctrine that nuncupations were to be tolerated only when made in the last sickness.

The provisions of the statute of frauds were not applied to nuncupations made by soldiers or seamen in actual service, and a similar exception was made in our own statute respecting wills, and in the act of 1 *Victoria, ch.* 26.

This privilege was borrowed from the Roman law, which authorized military testaments to be made, without restriction as to forms and ceremonies. The rule was generally followed in those countries which adopted the civil law, and was ultimately extended to the testamentary dispositions of mariners.

To enjoy the benefit of this immunity, the sailor or soldier must be in actual service—the sailor at sea, and the soldier in an expedition.

The privilege extends to all ranks and grades, whatever be the special occupation of the party.

Where the decedent was a cook on board of a steamship, and made a nuncupation in favor of his mother, while lying sick on board the vessel at her

wharf in Bremen—*Held*, that the case came within the exception of the statute—that he was to be considered as a mariner at sea, and might bequeath his property by a parol testament.

No particular number of witnesses is required to evidence the nuncupation, provided the proof be sufficient to satisfy the court as to the substance of the testamentary request or declaration.

THE SURROGATE.—The deceased, who was a cook on board of the steamship Hermann, departed this life at sea on the third of February last, while on the way from Bremen to Southampton. Two days before, when the vessel was lying at the wharf at Bremen, he told Frederick Pearson that he wished the money belonging to him, on deposit in the Seamen's Savings Bank in the city of New York, to be sent to his mother, residing at Glasgow in Scotland. This declaration was made in his last sickness, when the decedent expected to die, and with the intention of making a posthumous disposition of his property. Is this a good nuncupative will?

A nuncupative will, so termed, *à nuncupando*, that is, from naming an executor by word of mouth, is a verbal testamentary declaration or disposition. (*Swinburne, pt.* 1, § 12, *pl.* 1; *Godolph, pt.* 1, *ch.* 4, § 6.) By the common law it was as valid in respect to personal estate, as a written testament. A will could not only be made by word of mouth, but the most solemn instrument in writing might be revoked orally. In a rude and uncultivated age, to have required a written will would have been a great hardship, but with the growth and progress of letters, the reason for permitting a verbal testament diminished in force, until finally an effort to establish such a will by means of gross fraud and perjury, gave rise to the provisions of the statute of 29, Charles II., passed in 1676, termed the Statute of Frauds. (*Cole* vs. *Mordaunt, in* 4 *Vesey*, 196.)

Originally, nuncupative wills were valid, though not made in sickness. Afterwards, when writing became general, verbal dispositions were regarded with disfavor, and ulti-

mately were considered invalid unless made in the last sick-
ness. In the reign of Henry VIII. they were defined as pro-
perly made, when the testator lay languishing for fear of sud-
den death, and daring not to stay the writing of his testa-
ment. (*Perkins, Sec.* 476.) In the time of James I. they were
said to be usually made, when the testator was very sick,
weak, and past all hope of recovery. So it eventually be-
came settled doctrine, that nuncupations were to be tolerated
only when made in the last sickness, and a provision to that
effect was incorporated in the statute of frauds, in respect to
dispositions of personal estate exceeding a certain amount in
value. (*Prince* vs. *Hazleton*, 20 *J. R.*, 502 ; 7 *Bacon's Ab.*,
305 ; 6 *Wood Com.*, 574 ; 2 *Bl. Com.*, 500 ; 1 *Swift's Sys-
tem*, 420.) It is not necessary particularly to consider the
provisions of this statute, for they did not apply to the tes-
taments of soldiers and mariners, and now by the Revised
Statutes of New-York, as well as by the statute of 1 *Victoria*,
*ch.* 26, all nuncupations are invalid, except those made by
soldiers and seamen. The Revisers of our statutes reported
new restrictions upon nuncupative wills, but the legislature
abrogated them altogether, with the exception just stated,
and the same course was followed in the English statute.
(3 *R. S.*, *2d Ed.*, *Revisers' Notes*, *p.* 630).

The only nuncupative wills now allowed are those made
by soldiers and sailors. It appears from the preface to the
life of Sir Leoline Jenkins, that he claimed the merit, at the
time of the preparation of the statute of frauds, of having
obtained for the soldiers of the English army, the full benefit
of the testamentary privileges of the Roman army. The
Roman soldier was indulged with very peculiar rights and
immunities, in the way of exemption from the usual rules in
respect to wills. *Inter arma silent leges*—in the camp and
on the battle-field the testamentary law was silent. Amid
the excitement and the perils of warfare, the forms prescribed
by law for the execution of a will were dispensed with, so
that the soldier might declare his last wishes by word of
mouth ; or if, wounded, he wrote with his blood on his shield,

or with his sword in the dust, the disposition was held firm and sacred. This privilege was unknown in the republic, but when the civil and military authority were united in one person, and the army became the controlling power of the state, under Julius Cæsar, that celebrated commander authorized the making of the military testament, in any mode, and without prescribed ceremonials. The example thus set was subsequently followed by Titus, Domitian, Nerva and Trajan, until the usage became thoroughly established. (*Dig. lib.*, 29, *Tit.* 1, § 1.) It was extended also to the naval service; and officers, rowers, and sailors were in this respect esteemed as soldiers. (*Dig. lib.* 37, *Tit.* 12, § 1).

This was the foundation of those privileges of soldiers, in regard to nuncupative wills, which were allowed wherever the civil law prevailed, and which have been very generally adopted among civilized nations, (*Domat.*, *Pt.* 2, *Book* iii., *tit.* 1, *Sec.* 1, 3; *John Voet, Com. Pand.*, *lib.* 29, *tit.* 1; *Duranton, Tom.* 9, *liv.* 3, *tit.* 2; *Toullier, Tom.* 5, *liv.* 3, *tit.* 2.) In France, the *Ordonnance de la marine* of 1681, first gave special privileges to wills made at sea; and the ordinance of 1735 regulated the celebration of the military testament. The *Code Civil* has also adopted definite rules in regard to wills made at sea, in time of pestilence, or by soldiers in service. (*Art.* 981–8). In Holland, when commerce began to be extended to distant voyages, the question arose, whether wills made at sea were entitled to any peculiar immunity; and some jurists affirmed that they should be taken as military testaments. The matter was finally resolved in favor of their exemption, in case of persons sailing to, or returning from the Indies, by the ordinances of the West India Company, in 1672 and 1675. (*Voet. Com. Pand.*, *lib.* 29, *tit.* 1.) In England, by the statute of frauds, passed about the same time, the full benefit of the privilege was given, without restriction, to all soldiers and sailors in actual service; and, as I have already stated, this liberal rule has continued to the present day.

Nuncupative wills not being regulated by statute, as to

their mode of celebration or execution, the single question for the judgment of the court, is, whether the nuncupation was made by a person entitled to that privilege. The restrictions of the statute of frauds were not applied to wills made by " any soldier being in actual military service, or any mariner or seaman, being at sea." By the Revised Statutes of New York it was provided, that nuncupative wills should not be valid " unless made by a soldier, while in actual military service, or by a mariner, while at sea." (2 *R. S. p.* 60, § 22.) The terms of the exception in the statute 1 *Vict., ch.* 26, are, " any soldier being in actual military service, or any mariner or seaman, being at sea." The phraseology is slightly different in these statutes, but the rule is substantially the same in all—that the nuncupation is only valid, when made by a soldier in actual military service, or by a mariner at sea, at the time of the testamentary act. It is not enough to be a soldier or a sailor, but there must be actual service. The military testament was first conceded by Julius Cæsar to all soldiers, but it was subsequently limited by Justinian to those engaged in an expedition, *solis qui in expeditionibus occupati sunt.* (*Code, lib.* 6, *Tit.* 21, § 17; *Inst., lib.* 2, *Tit.* xi.) The exception was borrowed with the rule from the civil law, and the courts have invariably adhered to the principle, that there must be actual warfare, and the soldier be engaged *in expeditione.* (*The Goods of Johnson*, 2 *Curteis*, 341; *Re Phipps, ibid.*, 368; *Re Churchill*, 4 *Notes of Cases*, 47; *Merlin, Test. sec.* 2, § 3, *art.* 5, *art.* viii.; *White* vs. *Repton*, 3 *Curteis*, 818; *Drummond* vs. *Parish, ibid.*, 522; *The Goods of Perry*, 4 *Notes of Cases*, 402; *The Goods of Norris*, 3 *Notes of Cases*, 197; *The Goods of Tell*, 1 *Robertson*, 276, 4 *Burge. Com.* 394; *Cujac. Consult.*, 49.) So, also, the nuncupation of a mariner to be valid must be made at sea. (*Key* vs. *Jordan, in* 3 *Curteis*, 522.) It is sometimes difficult to determine when the mariner is to be considered at sea. For example—Lord Hugh Seymour, the admiral of the station at Jamaica, made a codicil, by nuncupation, while staying at the house on shore appropriated to the admiral of the station. The codicil

was rejected on the ground that he only visited his ship occasionally, while his family establishment and place of abode were on land, at the official residence. (*The Earl of Euston* vs. *Lord Henry Seymour, in* 2 *Curteis*, 339.)  But where a mariner belonging to a vessel lying in the harbor of Buenos Ayres, met with an accident when on shore by leave, made a nuncupative will, and died there, probate was granted, for the reason that he was only casually absent from his ship. (*In the Goods of Lay*, 2 *Curteis*, 375.)  The will of a shipmaster, made off Otaheite, has also been allowed. (*Re Thompson*, 5 *Notes of Cases*, 596.) In the present instance, the decedent made a nuncupation, when the vessel to which he was attached was lying at the wharf in Bremen.  He was at the time in actual service, on ship-board, and the nature of the service was continuous—not being limited to the particular voyage.  I think, therefore, he was entitled to the privilege.  A question arises, however, as to the character of his calling.  He was cook on board the steam-ship, and not what is ordinarily understood as a mariner.  The principle upon which the privilege of nuncupation is conceded, applies to all persons engaged in the marine service, whatever may be their special duty or occupation on the vessel.  As, in the army, the term "soldier" embraces every grade, from the private to the highest officer, and includes the gunner, the surgeon, or the general: (*In the Goods of Donaldson*, 2 *Curteis*, 386 ; *Shearman* vs. *Pyke, in* 3 *Curteis*, 539 ; *Re Prendegast*, 5 *Notes of Cases*, 92 ; *Merlin, Test., sec.* 2, § 3, *arts.* v. viii.)—so in the marine, the term "mariner" applies to every person in the naval or mercantile service, from the common seaman to the captain or admiral.  It is not limited or restricted to any special occupation on shipboard—but a purser, or any other person whose particular vocation does not relate to the sailing of the vessel, possesses the same right as the sailor. (*Morrell* vs. *Morrell*, 1 *Hagg.*, 51 ; *In the Goods of Richard Hayes*, 2 *Curteis*, 338.)  A cook is certainly as much a necessary part of the effective service of a vessel as the purser or the sailor, and there would seem to be no reason

why he should be excluded from the advantage of a rule, designed for the benefit of men engaged in the marine, without reference to the particular branch of duty performed in the vessel.

As well because the wills of soldiers and mariners were excepted from the operation of the provisions of the statute of frauds, as for the reason and ground of the exception, and the peculiar character of the military testament, it was never held requisite that these nuncupations should be made during the last sickness. Nor has any particular mode been prescribed in respect to the manner of making the testament. The very essence of the privilege consists in the absence of all ceremonies as legal requisites; or, as Merlin states the proposition—"Their form was properly to have no form." It is true, the Roman law required two witnesses; this, however, did not relate to the essence of the act, but only to the proof. In respect to evidence, we do not follow the civil or the canon law; no particular number of witnesses is required to verify an act judicially, and all the court demands, is to be satisfied by sufficient evidence, as to the substance of the last testamentary request or declaration of the deceased. This ascertained, the law holds it sacred, and carries it into effect, with as much favor and regard as would be paid to the most formal instrument, executed with every legal solemnity. The proof in this case shows that the decedent, in prospect of death, declared a wish that the deposit in the Savings Bank should be given to his mother. There must, therefore, be a decree of probate establishing that nuncupative disposition.