In the Matter of Proving the Last Will and Testament of EDWARD S. MILLER, Deceased.

Surrogate's Court, Columbia County, August 14, 1929.

*Hawver & Hawver*, for the petitioner Miller.

*McNamee & Wilson*, for a next of kin contesting.

WHITBECK, S.   This matter comes on for decision as to whether the proofs and circumstances offered are sufficient to entitle an alleged nuncupative will of the decedent to be admitted to probate. In approaching the matter I have given some examination of the origin and meaning of such wills in the body of the law.   It appears that it originated so far as can be determined in the Roman civil law and as such was in fact an oral will declared by the testator before witnesses and afterwards reduced to writing from their testimony; such a will was supposed to have been made *in extremis* or under circumstances fairly equivalent, such as prevented or hindered him from executing a more formal one.   However, the history of English jurisprudence discloses the fact that such wills became fruitful of frauds and perjuries and were eventually nullified by statute with the exception that they were permitted in the cases of " any soldier being in actual military service, or any

mariner being at sea," and it has been said that thus the British army and navy secured the full benefit of that testamentary privilege which the Roman soldier had enjoyed. Without reviewing the development of the law of nuncupative or oral wills in our country and State, it is sufficient to refer only to the present statutory provisions. Section 16 of the Decedent Estate Law provides as follows: " Unwritten wills of personal property, when allowed. No nuncupative or unwritten will, bequeathing personal estate, shall be valid, unless made by a soldier while in actual military service, or by a mariner, while at sea."

Section 141 of the Surrogate's Court Act, which defines the proof required generally in the case of written wills, provides that " before a nuncupative will is admitted to probate, its execution and the tenor thereof must be proved by at least two witnesses."

Thus our statutes define the class of persons who may make such a will and also the manner of making it. Beyond these two statutory declarations we must look for guidance to the few reported decisions of our courts on this subject.

Edward S. Miller, the decedent, was a member of Company F, Tenth Regiment, a local military company, which left the city of Hudson in July, 1917, for Fort Niagara; he was at that time a resident of the town of Claverack, Columbia county. From Fort Niagara the decedent with his military organization, which had become part of the Federal forces, was sent to Camp Wadsworth, located at or near Spartanburgh, S. C.; here the decedent remained as a soldier until he went overseas about May 18, 1918, as a member of the Twenty-seventh Division. It is not clear what his movements were after arriving in France but it does appear that he was in Belgium on a part of the Hindenburgh line in July or August, 1918, and was in the first line trenches. Just how or when he was killed is not disclosed other than by the stipulated facts that " decedent died October 18, 1918, while in active line of duty as a soldier in France, as a result of wounds." He left him surviving no widow or descendants but left his mother, Carrie A. Miller, who survived him but has since died, to wit, on or about January 5, 1929, and by three sisters and four brothers.

The testimony in regard to the oral will is briefly and substantially as follows:

The witness John Simmons, a soldier in the late war, a former member of Company F, Tenth Regiment, and with the same military organization as the decedent from the time his company left Hudson in July, 1917, until Miller, the decedent, went overseas in May, 1918, testified to a conversation had with decedent at Camp Wadsworth fixed by the witness as in the month of March,

1918, approximately. Decedent said that he "had it fixed so if he get killed his property would go to his mother and after her death to his brother, Emery." On a prior occasion in conversation with decedent, the latter had referred to his war risk insurance and at that time said he wanted his brother, Emery, to get his property after his mother was dead, if he should get killed or anything. Witness never saw decedent thereafter.

Up to the time when the decedent sailed for France he had written letters from which the following abstracts are made. Exhibit 4, purporting to have been written from Camp Stuart, Va., and in decedent's handwriting, states: "A few lines to let you know that I am saying good-bye for a long time but don't worry Boy the least about me for I may return and may not but nevertheless I will remember you forever. Keep good care of my letter until I come back and if I don't come back keep them and read them over and think of me."

This letter I have admitted, not as competent to show testamentary intent, but rather as bearing upon his testamentary capacity and his solemn appreciation of the uncertainties of his life.

Exhibit 3, purporting to have been written from Camp Wadsworth and dated December 29, 1917, to his brother, the petitioner, states: "One other thing — if anything happens to mother everything I got goes to you. None else can get it for I have sign it all to you."

The legal effect of this writing standing alone is, of course, nil; it was written before his nuncupation to the witness Simmons, but it likewise bears upon his testamentary capacity and his freedom from any unlawful testamentary influences.

The witness John E. Shook was with decedent in the same organization which left Hudson in the summer of 1917 for Fort Niagara. At Spartanburgh they were in the same regiment but not in the same company; they, however, saw one another frequently and had conversations. About April 1, 1918, witness had a conversation with decedent in which the latter stated he "had a will made — he had insurance and if anything happened he would leave it to his mother because his father was dead, and when his mother died he wished to leave it to his youngest brother, Emery Miller."

Witness states that he frequently talked with decedent in camp and that decedent was of sound mind.

Witness Gardner was with decedent in the same military units from the time of leaving Hudson in July, 1917, until some time after their arrival in France, when witness was transferred to a

transport; up to the time of his transfer witness was with decedent for about two months in the unit which was on the front line in Belgium. Witness testified that he had a conversation with decedent in July or August, 1918, at "Mount Poporange" in Belgium. Decedent had told witness that he had taken out $10,000 of war risk insurance and made it out to his mother, and witness asked him "what are you going to do if your mother dies," and decedent answered: "I am going to leave it to some brother." Upon a question by the court as to whether decedent said he was going to leave it to "*some*" brother or "*my*" brother, witness answered "*my brother.*" It is clear that the witness did not know or could not recall the name of the decedent's brother intended, and consequently the proof of the nuncupation to this witness is incomplete.

At about this time decedent wrote from "Somewhere in France" (Exhibit 11) (July 10, 1918): "I never worry for what is to come — when you hear that I layed away with the rest of some poor lads all you can say is he done his bit and bear it."

There follows in the month of August, 1918, the following letters from this soldier at the front, his life constantly in danger, enduring as best could be endured the rigors of modern warfare, yet having time to think of his family and those of them whom he chose as the objects of his bounty. "Just came out of the trench for a while but expect to go back shortly. I cannot write much this time. But I want you to know as I spoke *one* before if anytime anything happen to mother you come next on which a slip you keep to show that you are the right to have * * *. It certainly was some experience in the line — heaving shelling and gas coming over unexpectedly."

On the back of this sheet of the letter appears the following in decedent's handwriting:

"Keep this Letter"

"FRANCE *Aug.* 25, 1928

"To certify that Emery E. Miller shall have after Carrie A. Miller mother all property and voluntary allottment and government insurance. My serial number is 1210901. In case of death to be presented at War Department, Washington, D. C. for identification.

"Pvt. E. S. MILLER
"Co. F. 107 U. S. Inf.
"France
"American Ex Force."

On the same day apparently he writes to his sister as follows (Exhibit 2a): "DEAR SISTER — I have been under very heavy

shell fire and gas which is worse than shells * * *. Tell Emery to write * * * also tell him that he can let mother keep them until I come back and if anything should happen to her why then he shall have them, especially the emergency paper and insurance."

In *Matter of Hickey* (113 Misc. 261), decided by Surrogate FOLEY in 1920, two letters were written by the soldier and the portions of these letters relating to the disposition of decedent's property were admitted to probate. It is not clear from a reading of the opinion what proof was received as to the nuncupation though the surrogate states that there was corroboration by two witnesses. It is apparent that in deciding this case Surrogate FOLEY followed the Civil War case of *Botsford* v. *Krake* (decided in 1866, and reported in 1 Abb. Pr. [N. S.] 112) where an officer of the United States Army in 1864 wrote and sent a letter to his sister stating that if he was killed or did not return he wanted her to have his property and in which case the court admitted to probate the letter as a valid will. It is not clear to me in either of these cases just what oral declaration was made by the testator or whether it was difficult for the court to determine the tenor of the testators' wills which led it to admit the letters as the wills themselves. Perhaps it was a feeling that the letter in the handwriting of the deceased was the more accurate expression of the will of the testator than the interpretation by the witnesses of the oral declarations.

In weighing these two cases I have given much thought to the provisions of our present section 141 of the Surrogate's Court Act which provides that in the case of nuncupative wills the execution of the will and its tenor must be proven by at least two witnesses. This has been in the statute since the adoption of it by the Legislature in 1880 when the addition to the old Code of Civil Procedure was made of practice in Surrogates' Courts. I cannot find it in the statute prior to 1880. It was not there in 1837 when certain practice was adopted relating to the proof required in probate of wills; apparently it was not a part of our statutes in 1856 when Surrogate BRADFORD decided the case of a nuncupative will (See *Ex Parte Thompson*, 4 Bradf. 154), for he says in his opinion: " Nuncupative wills not being regulated by statute, as to their mode of celebration or execution, the *single* question for the judgment of the Court, is, whether the nuncupation was made by a person entitled to that privilege," and again: " In respect to evidence, we do not follow the civil or the canon law; no *particular number of witnesses is required* to verify an act judicially."

In *Botsford* v. *Krake* (*supra*), decided in 1866, there is no mention

made as to the kind and method of proof required, nor the number of witnesses required.

It seems to me that in cases where resort must be had to informality to carry out the wishes or will of the soldier, it is safer to follow strictly the statute which now requires that the " execution and the tenor thereof must be proved by at least two witnesses." The danger of relaxing this rule in favor of accepting unattested writings as testaments in themselves is obvious — it opens the door to forgery and fraud, coercion and undue influence and all of the evils which have sought to be eliminated by the Decedent Estate Law, which requires attestation by at least two subscribing witnesses.

I propose, therefore, to admit or reject this probate entirely upon whether it meets or fails to meet the test of the statute; whether " its execution " and " the tenor thereof " have been " proved by at least two witnesses."

In applying this test alone I am convinced that the execution of an oral testament was fairly made by the testator to the witnesses Simmons, Shook and Gardner, though as to the last-named witness his testimony is not sufficiently clear to prove completely the tenor thereof. That these declarations were made separately to these witnesses does not violate the Decedent Estate Law since it has been repeatedly held that the attestation of a written will may be made before witnesses separately and at different times or dates; this was decided by the Court of Appeals many years ago (*Hoysradt* v. *Kingman,* 22 N. Y. 372), and reiterated in the recent case of a nuncupative will in *Matter of Mallery* (127 Misc. 784; affd., 247 N. Y. 580). In fact, the cumulative effect of testator's separate declarations over the period of time from April to July in 1918, all substantially alike, rather appeals to my mind with greater probative force than one single occasion would for it indicates consistency and fixedness of intention. The tenor of the testator's oral testament is not so easily comprehended, not from any conflict in the testimony of the witnesses, but from the possible ambiguity of the declarations themselves. The declaration to the witness Simmons was in the following words, " he wanted his brother, Emery, to get his property after his mother was dead if he should get killed or anything." and to the witness Shook that he " would leave * * * his insurance * * * to his mother because his father was dead and when his mother died [he] wished to leave it to his youngest brother, Emery Miller," and to the witness Gardner with reference to insurance " he had made it out to his mother " and in reply to witness' query if his " mother died " testator stated: " I am going to leave it to my brother." The

question of construction or interpretation of the testament would be premature nor is it properly before the court for such purposes.

The tenor of the testament I find and decide is as follows: That testator gave and bequeathed his insurance and any other personal property to his mother, Carrie Adella Miller, and after her death to his brother, Emery Miller. I find that the decedent at the time or times of such nuncupation was of full age, sound mind and free from restraint and in all respects competent to make a will.

I direct that the said will may be admitted to probate as the last will and testament of the decedent as valid to pass personal property only; and that letters of administration *cum testamento annexo* be granted to the said Emery Miller upon his qualifying as required by law.

The petitioner in his verified petition in this proceeding has prayed for the admission to probate of the unattested writing hereinbefore quoted purporting to be a certificate or will of the decedent which, as I have above indicated, is not in my opinion entitled to probate as such. However, the petitioner may amend his pleading to conform to the proof. If this places contestant at any undue disadvantage, I will entertain a motion on her behalf to reopen the trial for the purposes of submitting testimony by way of defense.

Motions, if any, to be made before me on September 3, 1929, or decree settled on that date.