In the Matter of the Estate of WALTER ZAIAC, Deceased.

Surrogate's Court, Kings County, April 9, 1937.

*Frank Composto* [*Pierre J. Sherry* of counsel], for the petitioner Julia Taylor.

*Blum & Jolles* [*Joseph G. Blum* of counsel], for the Polish Consul, contestant, representing all other heirs and next of kin of deceased.

*Oswald M. Murphy*, special guardian for Francizek and Piotr Zaiac, infant nephews of deceased.

WINGATE, S.   No more eloquent argument against war as an institution of national policy could be conceived than that which is supplied by the history of the present decedent, whose physical demise occurred on November 6, 1934, but whose mental death dates back to the days of Chateau Thierry and the Champagne offensive from which he emerged wounded in body and broken in mind, condemned to incarceration for a decade and a half in one hospital after another.

A youth of Polish extraction, he enlisted in the armed forces of the United States on June 1, 1917, and became a private in the One Hundred and Sixty-sixth Infantry regiment of the immortal Forty-second, better known as the "Rainbow" Division.   He received his preliminary training for what superficial romanticists have on occasion been pleased to term the "great adventure" at Camp Perry and Camp Mills.   Eight months later the cataclysm terminating his conscious existence had occurred and today his surviving relatives are contending for the estate which has come into existence by reason of the savings by his committee in incompetency from the payments made by the government during the period of his living death as "compensation" for the destruction of all but bare existence.

The issues litigated concern the validity as testamentary dispositions of certain expressions, verbal and written, of his wishes respecting the disposal of his property in the event of his death. These were made after his entry into service and, if once valid, were admittedly unrevoked since subsequent to his discharge from active army service he was incompetent to make a testamentary disposition or alter one previously made.

These expressions, as demonstrated at the trial, are four in number, three verbal and one written.

Reviewing the verbal statements in the order in which testimony respecting them was adduced in the record, the recollection of the sergeant in charge of the decedent's platoon respecting his pertinent statements is first encountered. His main recital related to a conversation which occurred at Camp Mills prior to the embarkation for France and the front. This sergeant was in charge of the completion of the papers pertaining to the war risk insurance for his men. His testimony was that the deceased " asked me what the papers was about. I said it was a paper for insurance or similar papers, if he wished to have anything that was left behind go to a particular person he care for, a brother or sister or anybody that he wished to leave this article with or articles or moneys or anything that would come in his possession, in case that he was killed or died of wound or anything similar." " He said that he had a sister that he wished to look after in case anything would happen, and also receive anything that he had." " He asked me what the papers were about. I said it was about insurance. He asked me what would happen in case he died. I said the papers will take care of it. I said ' You made out papers to that effect. Whoever you named would receive your money in case you were killed — the papers — and the government would take care of it,' and that was all I could explain to him because he was very dense."

On cross-examination the witness stated that the subject immediately under discussion at the time this conversation occurred was decedent's war risk insurance.

The same witness related a general conversation at which the decedent was present which occurred in a dug-out just prior to the Champagne battle, in which his men were inquiring as to " what would happen in case they were killed," and the witness assured them that " whoever was named beneficiary would receive the money or insurance."

The witness was unaware of the identity of the sister referred to in his testimony as the beneficiary whom the decedent intended but it was conceded that the recipient named in connection with the insurance was Mrs. Julia Taylor residing at 341 Fifty-sixth street, Brooklyn (which is given in decedent's service record as his home address), with whom he was stated to have lived prior to his enlistment.

The second witness, whose testimony was taken by deposition, was a fellow soldier with the decedent in the same platoon. . He related the receipt by the decedent of letters and packages from

this same sister and told of conversations with him respecting his family and his statements that " this is the best sister he had." In discussing the devolution of their property in the event of their being killed, the decedent is reported to have said " he was supposed to assign property to his sister," " ' I had to sign for my sister,' " " if happened something to him and get killed, his sister gets his property," which statements the witness explained as meaning merely the recounting of an act performed and not as implying any compulsion.

In this connection it should be noted that both this witness and the decedent spoke English with comparative difficulty and even in their native Polish were semi-illiterate.

The third witness was a " girl friend " of the deceased who testified to several conversations with the decedent at times when he was absent on leave from Camp Mills prior to his departure for overseas. According to her testimony the decedent proposed marriage to her and on her refusal said: " as long as you don't want to marry me, anything happens to me during the war, everything goes to my sister Julia Taylor."

The final evidentiary demonstration consists of a letter in the handwriting of the deceased and signed by him, which was made a part of the record. It was written on the stationery of the " National War Work Council, Young Men's Christian Association of the United States, ' with the colors,' " with which every army veteran became so completely familiar during his service. It was in Polish and written to his sister Julia Taylor. It reads:

" DEAR SISTER: I inform you that I am still where I have been, that I am in good health and am wishing that the Almighty God keep you the same.

" I want to know whether brother Hipoltia has already left for the Camp, let me know about it if he has not left as yet.

" Now loving sister I want you to know that I had myself insured today for $5000 (five thousand) and it was drawn in your name and in the name of brother Hipolita, but you are first and the brother is second. I know when I am not alive you will get the money, but do no injustice to the brother, you would have to pay to brother Hipolita thousand dollars if he is alive, and if he is not alive, then every-thing is yours.

" This is my Will in which I bequeath to you all.
                    " Your ever well-wishing brother,
                              " WLADISLAW ZAIAC."

The foregoing is the original translation made by Mr. Joseph Buchner, who has served as the official Slavic interpreter of the County Court of Kings county for the past twenty-nine years.

Some controversy arose on the trial between him and an interpreter called on behalf of the respondents, who are a brother and sister residing in Poland, respecting certain details of the translation, particularly the last sentence prior to the valedictory. It was testified on the one hand that the word which has been translated " you all " might be either a formal method of address to the sister alone or might be a plural form. It was conceded, however, that the letter was obviously the product of an uncultured man and contained mistakes in grammar and spelling, wherefore arguments based on technically correct usage in Polish orthography or syntax possess no particular cogency, especially in view of the wholly patent desire which permeates the entire letter that the decedent's sister Julia and his brother Hipolita should be his sole beneficiaries, in the proportions stated.

In the legal evaluation of the demonstration made, the matter is viewable from two different aspects, namely, *first*, as to whether there is a showing of a wish on the part of the decedent respecting the disposal of his assets sufficient to prevent their devolution in intestacy, granting for the moment that the legally requisite forms have met with compliance; and, *second*, whether the modes of expression adopted comply with the pertinent rules of law for valid testamentary direction for a person situated as was the decedent at the time they were made. These subjects will be considered in the order stated, and in the evaluation of the former the same viewpoint will be adopted as if the verbal statements noted had been reduced to writing and such writing and the letter had been duly declared by the decedent to be his will and that such will had been executed and attested with all of the usually requisite formalities.

Were such the situation, there is no reasonable basis for a difference of opinion but that the composite expressions would constitute a wholly operative testamentary direction. The alertness and painstaking endeavor of courts of probate to search out and effectuate the wishes of a decedent in the testamentary expression of his desires respecting the devolution of his property is so familiar as to have become axiomatic. (*Matter of Rossiter*, 134 Misc. 837, 839; affd., 229 App. Div. 730; affd., 254 N. Y. 583; *Matter of Weissmann*, 137 Misc. 113, 114; affd. on opinion of this court, 232 App. Div. 698; *Matter of Crespi*, 158 Misc. 383, 384; *Matter of Draske*, 160 id. 587, 593.) This decedent told his sergeant that he wished his sister to " receive anything he had." To his comrade in arms the statement was that " if something happened to him * * * his sister gets his property," and in the deliberately prepared holographic document which bears his signature

he evinced a similar purpose with the sole qualification that the sum of $1,000 should go to his brother Hipolita. His intention was uniform, consistent and unmistakable. The form of the statements evincing the purpose is wholly immaterial since even in civilian wills this is universally disregarded where the intention is clear, and this rule is accorded the widest conceivable latitude in wills of soldiers and sailors, it being said: " ' *As for any precise form of words, none is required,* neither is it material whether the testator speak properly or improperly, so that his meaning appears.' " (*Hubbard* v. *Hubbard,* 8 N. Y. 196, 201.) (Italics in original.)

It is contended, however, that at the time of the expression of these wishes the decedent possessed no property and that his remarks were addressed solely to the devolution of his war risk insurance. His language, however, was broad enough to cover any other property which he might thereafter acquire, and in this connection, as in that of ordinary civilian wills, the disposition must, as to general gifts, be deemed to speak from the date of death (*Matter of Freeman,* 139 Misc. 301, 303; *Matter of Shevlin,* 143 id. 213, 217; *Matter of Duffy,* Id. 421, 422; *Matter of Schrier,* 147 id. 539, 540; *Matter of Quick,* Id. 28, 35; *Matter of Holmes,* Id. 394, 397; *Matter of Larney,* 148 id. 871, 878) and to cause any subsequently acquired property to devolve pursuant to its terms. (*Carley* v. *Harper,* 219 N. Y. 295, 304; *Heck* v. *Volz,* 14 N. Y. St. Repr. 409, 411; reported by memorandum only, 47 Hun, 635; affd., 120 N. Y. 663.) Not only is this result obvious on basic principles but the point was directly involved in *Matter of Mallery* (127 Misc. 784; affd., 220 App. Div. 794; affd., 247 N. Y. 580) and was so determined.

The uniform tenor of the decisions respecting wills of soldiers and sailors is addressed to the inquiry: Did the decedent give any intimation respecting his wishes for the disposition of his property? If this question is capable of affirmative answer, it has been the policy of the courts to effectuate the desire on one theory or another, and indeed, if none were readily at hand, then by main force.

The preliminary question of whether the decedent expressed a wish respecting the manner of disposition of his property being answerable in the affirmative, there remains for examination the query as to whether the mode or modes of expression which he adopted complied with the pertinent legal requisites to validity. In the examination of this question it is of importance to recall the pertinent history respecting the especial privileges which have been accorded to soldiers and sailors in this regard during the past two thousand years or more.

Formal written wills have been brought to light which antedate the Christian era by more than 2,800 years (Breasted, History of Egypt, p. 82); there is also the record of a will of the time of Amenemhet III (about 2000 B. C.), witnessed by two scribes with an attestation clause in certain respects resembling those now familiar (24 Irish Law Times, p. 223), and the will of Abraham bequeathing his entire estate to his son Isaac (21 Genesis, 10–14) will be recalled by Biblical students. Maine, in his profound study of the subject (Maine, Ancient Law [10th ed.], p. 216) observes, however, that "It is doubtful whether a true power of testation was known to any original society except the Roman," and concludes that "Whatever testamentary law exists, has been taken from Roman jurisprudence." (Id. p. 216.)

Whatever may be the truth respecting this generalization, students of the subject are agreed that the peculiar exemptions and privileges accorded to soldiers and sailors in the disposition of their property had their inception in the days of Julius Cæsar and his Gallic campaigns with which most schoolboys acquire an enforced familiarity. The principle which he applied in this regard was "inter arma silent leges" which has been paraphrased as "in the camp and on the battle-field the testamentary law was silent." As a result, it was permitted to a soldier to declare his devolutionary desires by word of mouth, or, if wounded, he was allowed to write with his blood on his shield or with his sword in the dust, and the direction thus made was effectuated. (1 Lomax on Executors, 40, 41.)

Dr. BRADFORD, the distinguished surrogate of New York county during the middle of the last century, has observed (Matter of Thompson, 4 Bradf. 154, 157) that when as a result of the celebrated passage of the Rubicon "the civil and military authority were united in one person, and the army became the controlling power of the State, under Julius Cæsar, that celebrated commander authorized the making of the military testament, in any mode, and without prescribed ceremonies" not only by soldiers but also by civilians. It became firmly established under the later Roman emperors (See Just. Inst. lib. 2, tit. 10, § 14) and thus found its way into the civil law and thence into the common law. As evidence of the wide prevalence of the practice during the Middle Ages, it is of interest to note that the wills of many of the English kings, among others, those of William the Conqueror, William Rufus, Henry I and Richard I were merely verbal. (12 Mich. Law Review, 467, 472.)

It will be observed that military wills which, as indicated, became permissible for general use, were in reality of two varieties, namely,

those which were purely verbal or " nuncupative " and those which were written in the hand of the decedent without attestation or even subscription. In the further consideration of the subject the distinctions between the two are important. Their legal differences in the common law are pointed out by Blackstone (2 Black. Comm. pp. 500, 501) as follows: " These testaments are divided into two sorts; written and verbal or nuncupative; of which the former is committed to writing, the latter depends merely upon oral evidence, being declared by the testator in extremis before a sufficient number of witnesses and afterwards reduced to writing. * * * As to written wills, they need not any witness of their publication. I speak not here of devises of lands, which are quite of a different nature; being conveyances by statute, unknown to the feudal or common law, and not under the same jurisdiction as personal testaments. But a testament of chattels, written in the testator's own hand, though it has neither his name nor seal to it, nor witnesses present at its publication, is good; provided suffi.;ient proof can be had that it is his hand-writing."

In the reign of Charles II, a national scandal in the case of *Coles* v. *Mordaunt* (4 Ves. 196) directed legislative attention to the absence of proper regulation respecting nuncupative or verbal wills, with the result that in 1676 a regulatory statute was enacted (29 Charles II, chap. 111) strictly prescribing the legal requirements for the validity of such dispositions of property by members of the general public. It is important to note, however, that this enactment expressly excepted soldiers and sailors from its operation, specifying in this regard:

" XXIII. Provided always, That notwithstanding this Act, any soldier, being in actual military service, or any mariner or seaman being at sea, may dispose of his movables, wages and personal estate, as he or they might have done before the making of this Act."

As a result of this statute two modes of testamentary disposition of personal property were authorized for the general public. A verbal will was valid if sufficiently proved and promptly reduced to writing, and a written will, though unattested and unsigned, was unassailable if demonstrated to be in the handwriting of the deceased. (*Mathews* v. *Warner*, 4 Ves. Jr. 186, 197, 198.)

The important point for recollection, however, is that this regulatory statute in no wise applied to soldiers or sailors in active service, and as to them any expression of testamentary desire, either written or verbal, was as wholly untrammeled and as scrupulously enforced as in the days of Julius Cæsar.

Such was the law of England at the time of the Revolution, and it is interesting to note that at an early date (1813) the New York Legislature enacted a statute almost identical in terms with that of Charles II (1 R. L. chap. XXIII, pp. 364–368). What is even more important for present purposes, however, is the fact that this enactment continued a reiteration of the exemption of the wills of soldiers and sailors from the operation of otherwise applicable rules, providing in section XVII: " *And be it further enacted*, That * * * any soldier being in actual military service, and any mariner being at sea, may dispose of his personal estate in the same manner as if this act had not been passed."

This review of the history of wills of personal property up to the date of the enactment of the Revised Statutes in 1829 accordingly demonstrates three salient facts, *first*, that whereas verbal or nuncupative wills had been permissible for general use for almost twenty centuries, for the last three hundred years of that period they had gradually fallen into disrepute and had been hedged about by increasing restrictions and limitations; *second*, holographic unattested wills had been likewise universally validated but had never been made the subject of similar censure, criticism or limitation (see *Watts* v. *Public Administrator*, 4 Wend. 168, 170); and, *third*, the use of both nuncupative and holographic wills by soldiers had been continuously authorized and approved, every enactment restricting their use by civilians being expressly declared to be inapplicable to men in military or naval service.

Such was the general situation respecting wills of personal property when the New York Legislature enacted the Revised Statutes in 1829. These contained two presently pertinent provisions. The first, incorporated in part 2, chapter 6, title I, article 3, section 40, read as follows:

" Every last will and testament of real or personal property, or both, shall be executed and attested in the following manner:

" 1. It shall be subscribed by the testator at the end of the will.

" 2. Such subscription shall be made by the testator, in the presence of each of the attesting witnesses, or shall be acknowledged by him, to have been so made, to each of the attesting witnesses.

" 3. The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed, to be his last will and testament.

" 4. There shall be at least two attesting witnesses, each of whom shall sign his name as a witness, at the end of the will, at the request of the testator."

The second is found in part 2, chapter 6, title I, article 3, section 22. Its wording was: " No nuncupative or unwritten will,

bequeathing personal estate, shall be valid, unless made by a soldier while in actual military service, or by a mariner, while at sea."

It will be noted that both of these enactments have been continued without the alteration of a word or a punctuation mark to the present day, and are now incorporated, respectively, in sections 21 and 16 of the Decedent Estate Law.

No additional pertinent enactment was made until 1880 (*Matter of Miller*, 134 Misc. 671, 675), when there was incorporated in section 2618 of the Code then adopted a sentence reading: " Before a nuncupative will is admitted to probate, its execution and the tenor thereof must be proved by at least two witnesses."

This has also been continued unchanged and is now part of section 141 of the Surrogate's Court Act. The foregoing represent all of the legislation on this subject in this State.

Returning to a consideration of the result upon the testamentary privileges of soldiers and sailors of the enactments of the Revised Statutes, it is, of course, well established that the effect of the statutes passed, and the legislative purpose in their enactment, must be evaluated in the light of the applicable historical background and of the conditions existing at the time their passage was accomplished, which they were designed to remedy. (*Matter of Frasch*, 245 N. Y. 174, 180; *Matter of Hamlin*, 226 id. 407, 414; *Matter of City of New York* [*Tibbett Ave.*], 221 id. 127, 131; *Woollcott v. Shubert*, 217 id. 212, 221; *Matter of Greenberg*, 141 Misc. 874, 881; affd., 236 App. Div. 733; affd., 261 N. Y. 474; *Matter of Davison*, 137 Misc. 852, 856, 857; affd., 236 App. Div. 684; *Matter of Morris*, 134 Misc. 374, 377.)

The salient features for recollection in this connection are, *first*, that verbal or nuncupative wills of personalty by civilians, whereas long permissible, had given rise to considerable scandal and had been a fruitful source of litigation for centuries with an ever-increasing limitation, legislative and judicial, upon their use, and, *second*, that the continuous immunity from all legislative restrictions upon the wills of soldiers and sailors had been in effect for more than two thousand years, had met with continuous legislative and judicial approbation, and had never, so far as reported decisions disclose, resulted in scandal or met with judicial disapprobation.

These facts render it most probable that the purpose of the legislative act of 1829 was merely once and for all to terminate the plague spot in the law respecting informal testamentary directions by civilians, but was not intended to affect or trench upon the particular privileges and immunities of soldiers and sailors which had existed unimpaired throughout the ages.

So far as concerns nuncupative or verbal wills, this purpose to leave the privilege of men in service unaffected has been determined by judicial construction from the somewhat circumlocutionary phraseology of section 22 of the Revised Statutes above quoted. By its terms, verbal wills were outlawed " unless made by a soldier," etc., and this exception has uniformly been metamorphosed into a positive authorization of the making of such a will by a man in service in spite of the fact that a verbal will is still a will, and in the face of the unequivocal and all-embracing provision of section 40 of the Revised Statutes that " *every* last will   *   *   * shall be executed and attested " in the manner therein prescribed.

The only logical explanation for this superficially anomalous interpretation of section 40 is on the theory that the Legislature did not contemplate that its sweeping enactment should apply in any particular to soldiers and sailors in service and intended that they were to be entitled in the making of their wills to the same exemptions which had been accorded them in all previous statutes. Such is the interpretation placed upon it in the only instance in which the question has been made the subject of judicial utterance by the Court of Appeals. In *Hubbard* v. *Hubbard* (8 N. Y. 196, 199) the court writes: " As to the wills of soldiers in actual service, and mariners at sea, *they are left entirely untrammeled by our statutes, and are governed by the principles of the common law.*" (Italics not in original.)

This statement of the purpose of the Legislature in the pertinent enactments of the Revised Statutes, which are still the law today, carries additional weight by reason of its proximity in point of time to the date of the enactment. It was made barely twenty-four years later, and at a time when the members of the court may well have possessed personal knowledge of the actual fact of the legislative intent.

The principle is of particular importance not only in any general consideration of the subject but directly in respect to the facts of the case at bar. If, as the Court of Appeals held, the testamentary privileges of men in service are wholly unaffected by these statutes, it follows that not only is a will by nuncupation permissible, but the alternate common-law privilege of a disposition by unattested holographic instrument must be sustained. Indeed such was the early determination in this State (*Botsford* v. *Krake*, 1 Abb. Pr. [N. S.] 112, 120) and has been the uniform result attained in other jurisdictions under somewhat similar statutes. (*Leathers* v. *Greenacre*, 53 Me. 561, 574; *Van Deuzer* v. *Gordon*, 39 Vt. 111, 119; *Rice* v. *Freeland*, 131 Va. 298; 109 S. E. 186, 187.)

On any broad consideration of the subject, it seems remarkable that any person could ever have attributed an intention to the revisers of 1829 to outlaw the certainty and definiteness of a demonstrated holograph and simultaneously to permit the continuance of the scandal-breeding and long-deprecated nuncupation. On ordinary principles of logic the extension of the greater privilege would seem inevitably to imply the continuation of the lesser, especially since, in ordinary civilian wills, the requirements respecting proof of a holographic instrument are uniformly relaxed. (*Matter of Beckett*, 103 N. Y. 167, 174; *Matter of Levengston*, 158 App. Div. 69, 71; *Perham* v. *Cottle*, 98 Misc. 48, 56; affd., 178 App. Div. 949; *Matter of Dodge*, 129 Misc. 323, 325; affd., 220 App. Div. 794; *Matter of Eyett*, 124 Misc. 523, 528; *Matter of Van Derzee*, 124 id. 539, 540.)

Whereas in recent years courts of first impression have (presumably from inertia) indicated a preference to base decisions upholding service wills on verbal statements rather than on holographic documents, only one reported case makes any direct attack upon the latter (*Matter of Miller*, 134 Misc. 671, 676), basing the objection on the grounds of the greater probability of " forgery and fraud, coercion and undue influence." Forgery, whereas a potentially universal danger in all written instruments, is an extreme rarity, and, even in civilian wills, there is an inference of volition indulged respecting holographic instruments which of itself negatives fraud, coercion and undue influence. No more cogent refutation of the bases of the invidious discrimination against a holograph, as made by the learned surrogate in the *Miller* case, could be imagined than is found in the language in *Matter of Turell* (166 N. Y. 330, 336), where Judge GRAY, writing for the unanimous court, observed: " It is, undoubtedly, true, in the case of a holographic will, that the dangers of fraud and imposition, or of undue influence * * * are greatly diminished * * *. The atmosphere of a testamentary instrument, wholly in the handwriting of the testator, is such as, naturally, to dispose the judicial mind to accept it as his will with less strictness in the proof of a compliance with statutory formalities."

In writing on the comparative preferences due to nuncupative and holographic wills of soldiers, the Supreme Court of Maine, in *Leathers* v. *Greenacre* (53 Me. 561), which, by reason of its almost invariable citation, appears to be generally regarded as the leading American authority on this subject, says (at p. 570): " For whatever may be said of the extraordinary caution which should be exercised by the courts in the establishment of *nuncupative* testaments, an *olographic* will, like the one before us in the present

case, stands upon a quite different footing, and, proof of its authenticity being made, the main question is,— was the position of the writer such that he might lawfully make a will without observing the customary formalities?"

Again, in *Matter of Smith* (6 Phila. 104, 107), Presiding Justice PEARSON, in referring to the dangers of nuncupation, speaks of the ever-present danger of such a mode of testation " depending on the frail testimony of slippery memory " and " A loose word spoken to a comrade, vaguely understood, or badly remembered."

Quite aside, however, from the conclusions which learned judicial officers may have reached in the safety and seclusion of their studies, no man who has experienced or witnessed the tenseness and terror in trench and dugout during the evanescent eternity immediately preceding the whistle which launches a troop of frightened boys from their comparative security into the mud, leaden hail and cadavers of no-man's-land, toward the probable destination of death, could even remotely compare in reliability the recollection after the lapse of years of a few words whispered at such a time, with the admittedly authentic written statement of such words prepared by their author in his own hand when the vision of death, although present, was not immediately before him.

For the reasons and on the authority given, the court is accordingly satisfied that, under existing law, the will of a soldier while in actual military service or of a mariner while at sea, is valid if in his own handwriting, or if made verbally and proved by the testimony of at least two witnesses.

The question thereupon arises as to when a soldier is " in actual military service " within the connotation of this essential requirement. On this subject authority is ample and substantially uniform. An extremely reasonable and satisfactory statement is found in *Matter of McGarry* (242 Mich. 287; 218 N. W. 774, at p. 290): " The necessity for this exception in favor of the soldier respecting wills is found in the stress, peril, urgency, and travail attending his being in actual warfare, his actual going into war or ' on an expedition,' his being in military service in the enemy's country, his being on the eve of embarkation and the like, and the lack of reasonable time, opportunity, and means for putting the will into form and in writing."

Similar statements or determinations based on a like conception of the law will be found in *Matter of Thompson* (4 Bradf. 154, 158); *Matter of Stein* (119 Misc. 9, 11); *Matter of Hickey* (113 id. 261, 263); *Matter of Mason* (121 id. 142, 145); *Matter of Gwin* (1 Tuck. 44,

46); *Matter of Mallery* (127 Misc. 784, 787; affd., 220 App. Div. 794; affd., 247 N. Y. 580); *Botsford* v. *Krake* (1 Abb. Pr. [N. S.] 112, 120); *Matter of Miller* (134 Misc. 671, 673); *Matter of Smith* (6 Phila. 104, 107); *Ray* v. *Wiley* (11 Okla. 720, 723; 69 P. 809); *Pierce* v. *Pierce* (46 Ind. 86, 91); *Leathers* v. *Greenacre* (53 Me. 561, 574); *Van Deuzer* v. *Gordon* (39 Vt. 111, 119) and *Gould* v. *Safford's Estate* (Id. 498, 505).

On the facts of this case, the determination in *Matter of Mallery* possesses particular relevancy, since there the testamentary act of the soldier was performed at Camp Dix, N. J., shortly prior to his embarkation for France. Whereas the affirmation on appeal without opinion of the results attained by the surrogate does not indicate appellate approval of his reasoning (*Rogers* v. *Decker*, 131 N. Y. 490, 493; *People ex rel. Palmer* v. *Travis*, 223 id. 150, 156; *Matter of Brush*, 154 Misc. 480, 483; *Matter of Avchin*, 158 id. 388, 391), it does certify to the correctness of his result. (*Scott & Co.* v. *Scott*, 186 App. Div. 518, 526.) The result there attained was that the will of the soldier there in question was one made by a man in actual military service within the connotation of the privilege, and thus inevitably involved the decision by the Court of Appeals that a soldier at an American training camp prior to embarkation is within that description.

In the present case the letter in question and the first statements to the sergeant were made at Camp Mills, N. Y. prior to embarkation, and, therefore, likewise come within the situation of such a privileged soldier. The statements to his fellow soldier occurred in France in the actual presence of the enemy. The testimony in support of nuncupation made to the third witness does not comply with the requirements, and must be disregarded as an independent basis for a testamentary disposition. (*Matter of Smith*, 6 Phila. 104, 107; *Matter of McGarry*, 242 Mich. 287, 290; 218 N. W. 774.)

In *Matter of O'Connor* (65 Misc. 403, 405) Surrogate KETCHAM enumerated the five essential requisites for a valid nuncupative will. These may be paraphrased as follows:

1. It must have been declared by a man who was at the time a soldier in actual military service, or a mariner while at sea.

2. The alleged testator must at such time have possessed testamentary capacity and been free from restraint.

3. The act must indicate a testamentary intent. (See, also, *Matter of Satar*, 275 Penn. St. 420, 422; 119 A. 478.)

4. The declarations must be sufficiently explicit and intelligible to permit a finding of their purport and scope.

5. The execution must be proved by at least two witnesses.

As demonstrated by authority, the facts of the present case comply with the first requisite. The second is amply proved by the record. The third has already been discussed and is amply shown to be present, and the fourth is obviously existent. The fifth has also been complied with if the matter be viewed from the standpoint of a verbal will, since it is thoroughly established in this State that the statements effecting the nuncupation need not be made to both witnesses at the same time. (*Matter of Mallery*, 127 Misc. 784, 787; affd., 220 App. Div. 794; affd., 247 N. Y. 580; *Matter of Mason*, 121 Misc. 142, 144; *Matter of Miller*, 134 id. 671, 675. See, also, accord, *Portwood* v. *Hunter*, 45 Ky. [6 B. Mon.] 538, 539; contra, *Wester* v. *Wester*, 50 N. C. [5 Jones Law] 95, 97; *Gibson* v. *Gibson*, 22 Miss. [1 Walker], 364, 366.)

It is obvious, therefore, that, even were the holograph to be disregarded, probate of the nuncupative will must be allowed.

In this situation it might seem strange to a superficial observer that the court has taken such pains to demonstrate its conviction that under existing law the holograph is admissible to probate. To such it may be pointed out that the terms of the nuncupation and of the holograph, whereas similar, are not identical, since, according to the recollection of the witnesses, the former bequeathed the entire estate to the decedent's sister Julia Taylor, while the letter, in addition, left a legacy to the brother Hipolita.

The court is satisfied that the holograph is the more reliable and accurate reflection of the wishes of this soldier, and it would deem itself unworthy of the sacrifice of this immigrant boy who voluntarily gave all for his adopted country and suffered a fate worse than death that its institutions might live, were it to spare any effort to validate his unquestionable wishes respecting the disposal of that which was his own.

The holographic instrument hereinbefore quoted will accordingly be admitted to probate, and letters will issue to Julia Taylor as the executrix thereof, according to the tenor of the will.

Enter decree on notice in conformity herewith.